UNITED STATES, Appellee

v.

Keith M. HENRY, Private, U.S.
Marine Corps, Appellant.

No. 93–1283.
CMR No. 92 0042.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 6, 1994.

Decided Aug. 1, 1995.

For Appellant: *Lieutenant Paul J. Ferdenzi,* JAGC, USNR (argued); *Lieutenant Franklin J. Foil,* JAGC, USNR.

For Appellee: *Major G.W. Fischer,* USMCR (argued); *Colonel T.G. Hess,* USMC, *Commander S.A. Stallings,* JAGC, USN, *Captain A. Diaz,* USMC (on brief); *Colonel J. Composto,* USMC.

*Opinion of the Court*

COX, Judge:

1. In the issues we granted for review (39 MJ 416), appellant contends that he was selectively prosecuted because of his race (Issue V) and that the United States Navy-Marine Corps Court of Military Review[1] abused its discretion in affirming a sentence that was disproportionate to those of his co-conspirators (Issue I).[2] We further specified an issue concerning whether appellant was provided conflict-free counsel.

2. Appellant, Private E-1, USMC, pleaded guilty, in Okinawa, Japan, to committing multitudinous offenses under the Uniform Code of Military Justice, 10 USC §§ 880-934.[3] The parties agreed that the maximum

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. *See* 41 MJ 340 n. 2 (1995) for disposition of the issue challenging the independence of the Court of Military Review (39 MJ 416).

3. The Charges and specifications of which appellant now stands convicted may be summarized as follows:

Charge I, Article 86.
Specification: From February 5 to March 15, 1991, absence without leave (terminated by apprehension).
Charge II, Article 123a.
Specification 1: Between February 5 and 15, 1991, making and uttering to the National Bank of Fort Sam Houston worthless sharedrafts in the amount of $2860, more or less, with intent to defraud and to obtain currency.
Specification 2: Between January 9 and February 11, 1991, making and uttering to the Okinawa Area Exchange a worthless sharedraft in the amount of $150, more or less, with intent to defraud and to obtain currency.
Additional Charge I, Article 81.

Specification 1: From December 1990 to March 1991, conspiring to steal 53 credit union sharedrafts from various Marines and to forge and utter the same sharedrafts, in the amount of $23,000.00, more or less.
Specification 2: From October 1990 to March 1991, conspiring to steal merchandise of a total value of $2000, more or less, from retail outlets; to steal 3 credit cards; and to steal hotel services, of a value of $600.
Additional Charge II, Article 121.
Specification 1: Between January and March 1991, larceny of a color television set of a value of $500, property of the Air Force Exchange.
Specification 2: Between January and March 1991, larceny of numerous credit union sharedrafts, the property of a fellow Marine.
Specification 3: Between January and March 1991, larceny of numerous credit union sharedrafts, the property of a fellow Marine.
Additional Charge III, Article 123.
Specifications 1-29 and 31-54: During January and February, 1991, forging and utter-

punishment to which appellant might have been sentenced included a dishonorable discharge, total forfeitures, and confinement for 293 years and 6 months. Instead, the military judge sentenced appellant to a dishonorable discharge, total forfeitures, and confinement for 16 years. Pursuant to the limitations of a pretrial agreement, the convening authority suspended confinement in excess of 15 years, but approved the remainder of the sentence.

3. This was not even appellant's first general court-martial. Some months earlier, also in Okinawa, he pleaded guilty to multiple crimes unrelated to the instant charges, but of a similar nature.[4] Appellant's service record also featured a prior nonjudicial punishment for unauthorized absence, and still earlier counseling for issuing other bad checks. (Pros.Ex. 1.)

4. Appellant's offenses herein can be broken into several broad categories. The central activity was the conspiracy (with Emanuel Evans, Cooke, Thomas, Stewart, and Childs) to steal and forge credit union sharedrafts (specification 1, Additional Charge I). Directly related to that conspiracy were specifications alleging larceny of the sharedrafts (specifications 2 & 3, Additional Charge II) and the 53 specifications of forging the sharedrafts (specifications 1–29 and 31–54, Additional Charge III). *See* note 3, *supra*. A separate conspiracy (with E. Evans, Nelligan, and Childs) involved the theft of retail merchandise, credit cards, and hotel services (specification 2, Additional Charge I). No other charges or specifications ap-

pear to relate to that conspiracy. The planning for both these conspiracies apparently began while appellant was still in the brig serving the unsuspended portion of his first sentence to confinement—while many of appellant's co-conspirators were also serving out court-martial sentences.

5. Another theft (of a color television set) appears to relate only to appellant (specification 1, Additional Charge II). Similarly, the two specifications of making and uttering multiple worthless sharedrafts with intent to defraud and to obtain currency (on appellant's own empty accounts) relate only to appellant (specifications 1 & 2, Charge II), as does his unauthorized absence (specification, Charge I).[5]

6. The general chronology of events may be summarized as follows: After appellant was released from the brig (on December 31, 1990) following his first court-martial, his unit began to process him for appellate leave. In due course, appellant was scheduled for a flight to the States on February 5, 1991. In January 1991, appellant commenced the crime spree which formed the basis of this court-martial. On February 1 and 4, 1991, the web began to tighten against appellant as Naval Investigative Service (NIS) agents interrogated two of his confederates, Stewart and Cooke, and attempted unsuccessfully to talk to a third, Evans. Apparently fearing he would be nabbed while boarding the plane, appellant skipped the flight and went into seclusion amidst the civilian populace of Okinawa (hence the unauthorized-absence

---

ing 53 credit union sharedrafts, of a total value of $22,851.00.
Appellant also pleaded guilty to an additional conspiracy (to stealing Armed Forces Identification Cards), but the Court of Military Review set aside that specification and dismissed it on the grounds that his plea was improvident. Presumably, that action reduced appellant's theoretical maximum confinement by 1 year. Para. 46e(1)(a), Part IV, Manual for Courts–Martial, United States, 1984. The Court of Military Review affirmed the sentence, nevertheless, as approved by the convening authority.

4. In that court-martial, appellant pleaded guilty to conspiring to commit forgery (Art. 81), stealing military property (Art. 121), and forging checks totaling $4,200.00 (10 specifications) (Art.

123). He was sentenced to a dishonorable discharge, confinement for 4 years, total forfeitures, and reduction to E–1. The convening authority approved the sentence, but suspended execution of confinement exceeding 10 months. The Court of Military Review affirmed on January 9, 1991, without opinion.

5. The Court of Military Review set aside appellant's pleas of guilty to another conspiracy (with McDaniel, Thomas, and Potts) specification, and it dismissed the specification on the ground that "the theft of identification cards was not planned or contemplated; it had already occurred" at the time appellant allegedly assented to the scheme. Unpub. op. at 4. This decision is not affected by our disposition.

charge). Operating from his hideout, appellant continued the crime spree until another of his co-conspirators, Childs, led investigators to him on March 15, 1991.

### Granted Issue I

7. Regarding the sentence-disparity issue, appellant's contention is straightforward. After all his confederates were sentenced, it became clear that appellant had received by far the most severe punishment. Although conceding that many of his colleagues were less involved in the offenses than he, appellant complained that at least several of them were equally culpable with him. Therefore, appellant contends his sentence was disproportionately severe. He first raised this matter by way of a petition for clemency to the convening authority. The staff judge advocate, in an addendum to his post-trial recommendation, presented to the convening authority abstracts of the other servicemembers' courts-martial, including the number and nature of charges and specifications, sentences adjudged, pretrial agreements, prior convictions and nonjudicial punishments, and service-record summaries.[6] Notwithstanding appellant's petition, the convening authority approved the sentence limitation mandated by appellant's pretrial agreement, without further reduction.

8. Before the Court of Military Review, appellant renewed his complaint that his sentence was "inappropriately severe" and "disproportionate" to those received by his co-actors. That court—observing that appellant had begun planning the offenses, concluding that he "recruited" his confederates while still serving his sentence from his first court-martial, and noting that appellant had "set off independently of his co-felons to commit additional offenses entirely on his own"—declined to grant appellant sentence relief. Unpub. op. at 5. In so declining, we find no error.

■ 9. As appellant correctly points out in his brief:

Congress enacted Article 66 of the Uniform Code of Military Justice with the purpose of establishing uniformity of sentencing throughout the armed forces.

The Board [of Review] may set aside, on the basis of the record, any part of a sentence either because it is illegal or because it is inappropriate. It is contemplated that this power will be exercised to establish uniformity of sentences throughout the armed forces. (See Art. 67(g) [ (1950) ].)

H.R.Rep. No. 491, 81st Cong., 1st Sess. 32–33 (1949).

Final Brief at 6.

10. Nothing in this record is inconsistent with that broad objective. Appellant's activities plainly were not identical with those of his co-actors. Moreover, even though several of them allegedly participated in significant ways in one or more of the conspiracies, it is apparent from appellant's own explanations during the providence inquiry that he was at least the overall mentor and custodian for the conspiracies of which he stands convicted. Thus, based on the record before it, the Court of Military Review did not abuse its discretion in declining to equate appellant's sentence to those of his fellows. *See United States v. Olinger,* 12 MJ 458 (CMA 1982); *United States v. Dukes,* 5 MJ 71 (CMA 1978); *cf. United States v. Ballard,* 20 MJ 282 (CMA 1985).

### Granted Issue III

11. Appellant's contention of selective prosecution, although somewhat akin to the sentence disparity contention, is substantially different. The sentence-disparity complaint was addressed to the Court of Military Review's discretionary sentence-review function and was based on the found level of criminal activity of the respective co-conspirators. The selective-prosecution allegation, on the other hand, is addressed at the prosecution function; it seeks to "go behind" the specific charging decisions; and it is specifically race-based.

■ 12. Because appellant pleaded guilty at his court-martial and made no mo-

---

6. As neither party disputes the accuracy of these summaries, we will assume them to be accurate for the purposes of this appeal, as apparently did the Court of Military Review.

tion there to dismiss or for appropriate relief, the pertinent "facts" regarding the allegedly selective prosecution have not been subjected to any evidentiary process or any findings of fact. Ordinarily, a failure to make such a motion at trial constitutes waiver. *See generally* RCM 905–07, Manual for Courts–Martial, United States, 1984; *Tracey v. United States*, 739 F.2d 679, 682 (1st Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985); *United States v. Taylor*, 562 F.2d 1345, 1356 (2d Cir.1977). However, because many of appellant's confederates were not tried until after appellant's trial, the full picture may not yet have emerged at that point.[7] A collateral-type attack may be his only realistic opportunity to raise the issue. *Cf. United States v. Dykes*, 38 MJ 270 (CMA 1993).

■ 13. Appellant makes numerous representations in his affidavit and pleadings, some of which can be rejected outright. For example, he asserts: "[T]he Government's sole criteria for prosecuting him was the fact that he is a black servicemember." Brief on Issue V at 1. Given appellant's prior record and the voluminous offenses to which he pleaded guilty herein, this statement is patently absurd. If the Marine Corps makes a practice of condoning such activities when perpetrated by white servicemembers, that is certainly news to us. Whether appellant and other minority servicemembers were prosecuted more aggressively than similarly situated non-minorities, however, remains an open question. Prosecutorial discretion cannot be based on race. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524,

1531, 84 L.Ed.2d 547 (1985); *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

■ 14. In that regard, appellant makes the following two factual representations, which are neither rebutted nor denied by the Government:

a. Of the ten servicemembers identified as being involved in the three conspiracies of which appellant was originally charged, only the five black servicemembers were placed in pretrial confinement.

b. Of the numerous servicemembers, black and white, suspected by the authorities of being involved in the forgery offenses, only the black servicemembers were required to submit handwriting exemplars.

*See* Brief on Issue V at 2.

15. Appellant also complains that the most culpable of the white conspirators, Childs, was given complete immunity from prosecution; that the remaining white servicemembers were systematically undercharged; and that the black servicemembers, including himself, were systematically overcharged for similar conduct. The Government has not denied that Childs, specifically, was deeply involved in the major conspiracies. Rather, the Government's position from the beginning (*i.e.*, in the addendum to the staff judge advocate's recommendation, before the Court of Military Review, and before us) has been that Childs was the first conspirator to "come forward" and cooperate with the authorities (unpub. op. at 5); therefore, he got the best deal.

---

**7.** Appellant's court-martial occurred on June 12, 1991. Conspirator Cooke was court-martialed the same day. Conspirators Evans, Stewart, and Thomas were tried on July 1, July 15, and July 18–19, 1991, respectively. Two other players were court-martialed before appellant, and two others were administratively separated without court-martial.

Given the timing of these trials, it is reasonable to infer that original charges against Evans, Stewart, and Thomas may already have been extant at the time of appellant's trial, and those charges may already have been investigated (Art. 32, Uniform Code of Military Justice, 10 USC § 832) and even referred to a court-martial. It is not obvious from the record, however, that appellant and his counsel must already have

known, on June 12, whether a pattern of discrimination was developing. Therefore, it is not obvious that the defense waived a selective-prosecution claim.

If we were to assume that discrimination was already in the wind by June 12, that only indicts the competence and objectivity of trial defense counsel for failing to raise it, and it further entwines the selective-prosecution and denial-of-conflict-free-counsel issues. *See* text, *infra*. In light of the as yet unresolved cloud of uncertainty surrounding counsels' performance, we are not prepared to charge appellant with the responsibility of being his own lawyer on this issue and with waiving the issue by failing to raise it himself.

16. Appellant vehemently disputes this representation. He notes—and the record confirms—that several of the black conspirators confessed, naming appellant as a participant, long before the agents prevailed upon Childs to assist them. In addition, appellant alleges that several of the black conspirators offered to cooperate with the Government, but were spurned, long before the agents sought out Childs for special treatment. Appellant also alleges numerous other instances and particulars in which the remaining white conspirators were extended special privileges, considerations, and concessions not extended to himself or the other black suspects.

17. In addition to his own affidavit, appellant has provided an affidavit from a servicemember who was apparently unconnected with the instant charges. That Marine swears under oath that the prosecutor in appellant's case made several blatant, racially prejudicial remarks about appellant, his case, and his black colleagues. If found to be true, this statement in and of itself would go far toward confirming appellant's contentions. Finally, looking only to the forgery-related charges leveled against appellant and his co-conspirators, the possibility arises that not all of the conspirators were held equally liable for the actions of the other conspirators. *See* para. 5c(5), Part IV, Manual, *supra; Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

18. Considering the reasonable indications and inferences of record, the affidavits submitted by appellant, and especially the unresolved questions of conflict-free counsel, *infra,* we think appellant has made enough of a showing to warrant further consideration of his relinquishment of his selective-prosecution claim. *See infra.*

### Specified Issue

19. The conflict-of-counsel issue comes to us on the thinnest of records. Appellant's hearing under Article 32, UCMJ, 10 USC § 832, was conducted on May 16, 1991. He was represented by Captain J.F.X. Kennedy, individual military counsel, RCM 506(b), and Captain J.M. Sessoms, assistant defense counsel. Among those testifying against appellant at that hearing was appellant's alleged co-conspirator, Private Nelligan. The same two counsel represented appellant at his court-martial, on June 12, 1991, in the same capacities.

20. At appellant's court-martial, in the midst of the providence inquiry, immediately after a brief recess, the military judge announced that it had come to his attention

that there may be an issue of conflict with regard to defense counsel representation in that Captain Sessoms has indicated that he has represented [co-conspirators] Private Potts and a Lance Corporal McDaniel. And in addition, it's also come to my attention that Private Henry may have been represented by other counsel in this case.

21. At the judge's bidding, Captain Kennedy briefly explained "the record [of] the detailing of defense counsel." Captain Paul Hackett was first detailed as appellant's counsel. Art. 27(a)(1), UCMJ, 10 USC § 827(a)(1). However, according to Kennedy, "due to a conflict with other individuals that potentially may be involved in these charges," Hackett was relieved, and appellant requested that Captain Sheryl Gatewood be appointed individual military counsel. Later, "for the same reasons" (*i.e.,* she "had a client who potentially might—"), appellant requested and was assigned Captain Kennedy as individual military counsel, *vice* Captain Gatewood, who was excused. At some unspecified point, Captain Sessoms was added as assistant defense counsel. The nature of Captain Gatewood's conflict was not further indicated. As for Captain Hackett, we know from appellant's Article 32 hearing that, before conspirator Nelligan agreed to testify against appellant, he consulted with his own counsel—the same Captain Hackett.

22. Captain Sessoms explained his connections with four of appellant's alleged co-conspirators, as follows:

I represented Private Nelligan at a special court-martial. ADC [assistant defense counsel] on Private McDaniel at a special court-martial. I was the detailed defense counsel on Private Potts at a special court-martial. I was the detailed defense coun-

sel at two of Private Emanual E. Evans' special courts-martial.

Sessoms did not, however, clarify the time periods of his attorney-client relationships with these other individuals or indeed say whether he even represented them in trials related to the instant charges.

23. The record of trial does make it clear that neither of appellant's trial defense counsel fulfilled his obligation to discuss with appellant the potential multiple-representation conflicts that might arise. *See* RCM 901(d)(4); Standard 4–3.5 ABA Standards for Criminal Justice: The Defense Function (1979); *see generally* Annot., 18 ALR 4th 360 (1982) ("Circumstances Giving Rise to Prejudicial Conflict of Interests Between Criminal Defendant and Defense Counsel—State Cases").

24. When Captain Sessoms was asked by the military judge if he had "disclosed previously all these representations to Private Henry," Sessoms responded: "I have not, to my knowledge, personally disclosed them to Private Henry." Sessoms went on to indicate that he had disclosed the representations to his own detailer and to Captain Kennedy, and that he was "confident" that appellant was "aware, through his own dealings or through his discussions with Captain Kennedy, of my representation of some, if not all of those clients."

25. Captain Kennedy, for his part, asserted that

Henry was aware to a limited degree that Captain Sessoms had represented some of these individuals. I can't say he knew exactly, sir, but he was aware that some of these people Captain Sessoms had represented....

26. Thus, it was during the post-plea providency inquiry itself that appellant first heard his counsel articulate, with any degree of specificity, Captain Sessoms' attorney-client relationships with four of the potential witnesses against him!

27. Of course it would not be surprising if appellant, through his own contacts, had come to know who else his counsel represented. On the other hand, since appellant's freedom of movement and communications

throughout the entire pretrial period were curtailed by pretrial confinement, we can hardly assume he knew this.

28. Moreover, because the matter was in effect sprung upon appellant during his trial and because his counsel assured the military judge on the spot that they personally perceived no conflict in Captain Sessoms' roles, we will not treat appellant's uncounseled acquiescence as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). For that to occur, somebody, at some point, would have to have laid out for appellant at least the basic ramifications and pitfalls of the arrangement so that he could make informed judgments as to (1) whether his counsel had a conflict of interest in the first place and (2) if so, whether he wished to waive his right to conflict-free counsel. *See generally Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

29. The instant record suggests numerous potential lines of inquiry that cannot be answered with the information before us. For example, what was the timing, nature, and extent of Captain Hackett's representation of appellant and Nelligan? Were any of Captain Hackett's efforts on behalf of Nelligan detrimental to appellant? What, if any, privileged information did Captain Hackett learn from appellant, and could it have aided Nelligan at appellant's expense?

30. Whom did Captain Gatewood represent besides appellant, and when and to what extent? Were any of the actions she took on behalf of her other client(s) adverse to the interests of appellant?

31. When did Captain Sessoms represent the other conspirators and on what charges? Were any of the actions he took on behalf of those clients inimical to the interests of appellant? Did Captain Sessoms' representation of his other clients have any impact on his ability to contest the charges against appellant?

32. Regarding Captain Kennedy, it is not alleged that he had any personal conflict of interest in this case. Yet, while the Government viewed appellant as the ringleader of a vast criminal enterprise, the reason Captain Sessoms was assigned to assist Captain Kennedy is that this was Kennedy's first general court-martial. Was appellant's decision to request Captain Kennedy as individual military counsel the product of a fair choice or was it the result of a *fait accompli* due to a dearth of other qualified, conflict-free counsel?

33. Suffice it to say, the military judge's inquiry here was insufficient to determine whether "counsel actively represented conflicting interests" or whether an "actual conflict of interest adversely affected counsel's performance." *United States v. Smith*, 36 MJ 455, 457 (CMA 1993); *see also United States v. Hurtt*, 22 MJ 134 (CMA 1986); *United States v. Breese*, 11 MJ 17 (CMA 1981). To resolve these and related questions, further inquiry is required.

The decision of the United States Navy–Marine Corps Court of Military Review is set aside, and the record of trial is returned to the Judge Advocate General of the Navy for remand to the Court of Criminal Appeals for reconsideration of appellant's claim that he was denied conflict-free counsel. That court has factfinding powers under Article 66(c), UCMJ, 10 USC § 866(c), not accorded this Court under Article 67(c), UCMJ, 10 USC § 867(c) (1989), and it may be able to resolve the issue by comparing appropriate affidavits. If the court below determines that appellant's counsel were not conflict-free, a rehearing may be ordered. If the court below determines that appellant's counsel were conflict-free, that court will consider whether appellant's claim of selective prosecution was waived by failure to timely raise it. In the event that either issue cannot be appropriately resolved by affidavits, that court may order a limited evidentiary hearing or a full hearing as necessary. *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967); RCM 810 and 1107(e)(1)B)(iii); *cf. United States v. Payton*, 23 MJ 379 (CMA 1987).

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.