UNITED STATES, Appellee,

v.

James T. MURPHY, Sergeant,
U.S. Army, Appellant.

No. 64,926.
CMR No. 8702873.

U.S. Court of Appeals for
the Armed Forces.

Argued May 15, 1997.

Decided Dec. 16, 1998.

Sullivan and Crawford, JJ., filed dissenting opinions.

COX, C.J., delivered the opinion of the Court, in which GIERKE and EFFRON, JJ., joined. SULLIVAN and CRAWFORD, JJ., filed dissenting opinions.

For Appellant: *Captain Richard E. Burns, Captain Mark I. Goodman,* and *Captain Kurt Mayer,* USAR (argued); *Colonel John T. Phelps, Major Fran W. Walterhouse, Captain Beth G. Pacella,* and *Captain Victor A. Tall* (on brief); *Captain Arden B. Levy.*

For Appellee: *Major Lyle D. Jentzer* and *Captain Steven H. Levin* (argued); *Colonel John M. Smith, Lieutenant Colonel Eva M. Novak, Captain Michael E. Mulligan,* and *Captain Kenneth G. Wilson* (on brief); *Lieutenant Colonel James L. Pohl.*

*Amicus Curiae* urging reversal: *Sandra Tvarian* (law student) (argued); *Richard J. Wilson* and *David M. Vaughn* (law student) (on brief); *Elliott S. Milstein.*

Chief Judge COX delivered the opinion of the Court.

Appellant, Sergeant (SGT) James T. Murphy, stands convicted of three specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918, and single specifications of larceny, bigamy, and false swearing, in violation of Articles 121 and 134, UCMJ, 10 USC §§ 921 and 934, respectively. He was sentenced by a general court-martial to death. The Court of Military Review (now the Court of Criminal Appeals) affirmed his convictions and sentence to death. 36 MJ 1137 (1993). His appeal is mandated by Article 67(a)(1), UCMJ, 10 USC § 867(a)(1)(1994).

Appellant has raised numerous issues in his appeal, many of which are classic appellate issues relating to the trial, the jurisdiction of the court-martial, evidentiary rulings, discovery questions, and the like. However, interspersed among these are numerous collateral attacks on his conviction, primarily based upon his claims of ineffective assistance of counsel. *See* APPENDIX for a complete list of the issues raised by appellant.

Upon careful consideration of appellant's claims, we agree that he received ineffective assistance of counsel as to his sentencing case. Accordingly, we set aside the decision of the Court of Military Review and return the record to the Judge Advocate General of the Army for further action consistent with the decretal paragraph of this opinion.

Unlike the practice in the United States Courts of Appeals and District Courts, neither the UCMJ nor the Manual for Courts–Martial, United States, 1984, provides procedures for collateral, post-conviction attacks on guilty verdicts. *See* 28 USC § 2255, *et seq.* Nevertheless, we have relied upon a variety of procedures to ensure that a military accused's rights are fully protected. *See, e.g., United States v. Henry,* 42 MJ 231, 238 (1995) (remanded to Court of Criminal Appeals for consideration of affidavits of respective parties); *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967) (eviden-

**6**

tiary hearing). In this case, we have elected to consider not only the record of trial, but also numerous affidavits filed subsequent to the trial in order to determine if appellant has shown good cause for relief to be granted. Arts. 67 and 59(a), UCMJ, 10 USC §§ 867 and 859(a), respectively. In so doing, we have carefully considered all of the issues raised by appellant before the Court. However, we will discuss only two general areas of concern: one of these, *in personam* jurisdiction of the court-martial to try him, by its very nature must be resolved at the threshold; the other, in our view, is dispositive of his appeal.

First, we will consider whether there was jurisdiction, under principles of international law, to try appellant in Germany, by United States General Court–Martial, for the murder of his former wife and former stepson, who were German citizens and were not his "dependents" at the time of the homicide. Second, we will consider whether appellant is entitled to a new trial on the ground that he did not receive effective assistance of counsel.

THE FACTS

Petra Murphy, a citizen and resident of Germany, had been married to appellant. She had a 5–year–old son, Tim, before she married appellant, and she had a second son, James, Jr., by appellant. During the months prior to the murders, she and appellant had an ongoing, acrimonious divorce proceeding pending in the German courts. In June 1987, appellant married Beate, another German citizen, although he had not yet divorced Petra. In July 1987, appellant visited North Carolina, where he obtained a divorce from Petra on the grounds of a 1–year separation. In August 1987, appellant received military orders requiring him to transfer to Redstone Arsenal, Alabama.

Sometime between August 16, when Petra was last seen alive by a fellow church member, and August 20, when appellant left Germany, appellant went to Petra's apartment. There, according to his confessions, he killed her by smashing in her head with a hammer. He also admitted that he killed Tim and James, Jr.

The bodies were discovered on August 23, when Petra's pastor, Chief Warrant Officer Two Smith, tried to ascertain why she had missed several church activities. Smith went to her apartment, where he encountered an unusual odor. He reported his findings to the German police. They investigated and discovered the bodies of the three victims.

This discovery precipitated an investigation by both the German authorities and the U.S. Army Criminal Investigation Command (CID). On August 27, 1987, appellant gave the first of several confessions to the authorities. Ultimately, he gave a written statement to the CID, in which he admitted that he had killed his former wife and the two children.

Appellant was taken into custody at Redstone Arsenal and was returned to Germany, where he was placed in pretrial confinement by the U.S. Army in the Mannheim Confinement Facility, Germany. While there, he also confessed his guilt to two fellow inmates, and he made incriminating statements to Sergeant First Class James Marek.

THE JURISDICTIONAL QUESTIONS

The Constitution of Germany prohibits imposition of the death penalty. From that vantage point, appellant now asserts that he was "100 percent" in favor of having the German Government exercise jurisdiction over the offenses in question. His basic premise is that primary jurisdiction over the homicides of his former wife and her son was with the German Government, and that the German Government would have exercised jurisdiction over this case had the German authorities realized they had primary jurisdiction. *See* Art. VII.3, North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA), 4 UST 1800, as applicable to Germany effective July 1, 1963, 14 UST 531. More specifically, his attack is three-fold.

First, he asserts that, by operation of certain laws and regulations, he was denied effective assistance of counsel in presenting his views to the German authorities. Specifically, he claims that his detailed defense

counsel were prohibited by law, the Logan Act, 18 USC § 953 (1982), and by military regulation, U.S. Army Europe Regulation 550–56, from actively representing him in the negotiations with the local German prosecutors concerning the question of jurisdiction.

Second, he contends that the German prosecutors were acting under a false belief that the United States had primary jurisdiction over the case under the existing NATO SOFA, and he argues that American authorities had either mistakenly or purposely informed the German prosecutor that all of the victims in the case were "dependents" within the meaning of the treaty when, in fact, they were not. If this is the case, argues appellant, jurisdiction over him was acquired in contravention of a treaty, the NATO SOFA. Relying on the distinctions made by the Supreme Court in two landmark cases, *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), appellant argues that, if he is correct, then the United States was without jurisdiction to try him.

Third, appellant argues that he was clearly prejudiced. In this regard, appellant contends that a letter from the German Minister of Justice to the Attorney General of the United States clearly shows that German authorities would have exercised jurisdiction if they had not been mistaken about the true facts.

Government counsel counter these arguments in several ways. They assert that: (a) appellant has no standing to raise the issue; (b) appellant waived any claim for relief because he did not object to the trial prior to completion of the court-martial; and (c) in any event, to the extent that any claim for relief must be based upon Government misconduct, the United States was free of any wrongdoing here.

■ We resolve all of these claims against appellant. We agree with the Army Court of Military Review that appellant has no standing to object to the process. RCM 201(d)(3), Manual, *supra*, as amended, provides:

> Where an act or omission is subject to trial by court-martial and by one or more civil

tribunals, foreign or domestic, the determination which nation, state, or agency will exercise jurisdiction is a matter for the nations, states, and agencies concerned, and is not a right of the suspect or accused.

This provision is based upon principles of sovereignty long recognized by the Supreme Court. *See Ponzi v. Fessenden*, 258 U.S. 254, 260, 42 S.Ct. 309, 66 L.Ed. 607 (1922), which states:

> One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that.... He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it.

*See also Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957).

■ Assuming, however, that appellant has standing to complain about the exercise of jurisdiction over him by the U.S. Army, he nevertheless loses. The Supreme Court in *Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), held that the test for whether a military court-martial has jurisdiction to try an accused is the military status of the accused. *But cf. Loving v. United States*, 517 U.S. 748, 774, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (Stevens, J., concurring); *compare with Relford v. Commandant, U.S. Disciplinary Barracks, Ft. Leavenworth*, 401 U.S. 355, 365, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) (query whether appellant satisfies all twelve factors to defeat jurisdiction in military court-martial).

It is uncontested that, at all times pertinent to this case, appellant was a member of the U.S. Army and subject to the jurisdiction of the court-martial. Art. 2, UCMJ, 10 USC § 802. Furthermore, he was taken into custody in the United States and was never released to the custody and control of Germany. Accordingly, even if the conduct of United States military authorities in Germany misled German authorities into a decision

not to seek the return of appellant to the custody of Germany for prosecution, appellant was, nevertheless, lawfully subject to the jurisdiction of the court-martial. *In personam* jurisdiction over him existed because of his status as a soldier in the Army, not as a result of his person being turned over to the United States by a foreign government pursuant to an extradition treaty. Therefore, his reliance on *United States v. Rauscher* is misplaced.

We need not decide whether the Logan Act or the U.S. Army Europe Regulation can indeed prevent a defense counsel from communicating with German prosecutors. Nor do we resolve the issue by holding that appellant waived his right to contest jurisdiction. That merely raises other questions as to the competence of his attorneys, which we discuss next.

### The Claims of Ineffective Assistance of Counsel

Appellant makes a broad-based attack upon the performance of his trial defense counsel. In order to evaluate properly appellant's multiple claims, it is first necessary for us to put the case into perspective. Thus, we must carefully review every aspect of the case and balance the claims against the total record before us. That review includes consideration of the training, experience, and abilities of trial defense counsel; the pretrial proceedings; the investigative efforts of the defense team; the selection of the court members; the trial strategy; the performance of counsel during the trial; the sentencing case; and the posttrial proceedings.

■■■ It is beyond dispute that a military member is entitled to effective assistance of counsel. *United States v. Scott*, 24 MJ 186 (CMA 1987). When we look for effective assistance, however, we do not scrutinize each and every movement or statement of counsel. Rather, we satisfy ourselves that an accused has had counsel who, by his or her representation, made the adversarial proceedings work. *United States v. DiCupe*, 21 MJ 440 (CMA 1986). In evaluating claims of ineffective assistance of counsel, we have

adopted the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Loving*, 41 MJ 213, 241 (1994), *aff'd on other grounds*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. 2052; *See United States v. Scott, supra.*

We wish to make it clear at the outset that our review of defense counsels' performance in this trial does not reveal anything which suggests that they were less than totally dedicated to the defense of SGT Murphy. Our review of the decisions, actions, or inactions of defense counsel is conducted in the calm atmosphere of appellate review. Our vision considers the fog of battle, but it is also clarified by the guiding lights of aggressive appellate counsel. We also have the benefit of having reviewed numerous cases over the years and developed a sense of the standards of performance that can reasonably be expected of defense counsel. We are not looking for perfection, but rather we are seeking to ensure that military accused are represented by "reasonably competent" counsel, and that the results obtained at trial are reliable. *Strickland v. Washington, supra; United States v. Polk*, 32 MJ 150 (CMA 1991). With these thoughts, we first look at the defense counsel in this case.

### Defense Counsel

Two U.S. Army Judge Advocates, Captains (CPT) Richard Vitaris and William Schneller, were "detailed" by CPT Vitaris, the Senior Defense Counsel, Hanau Field Office, U.S. Army Trial Defense Service, to represent appellant at trial. The only statement on the record as to the qualifications of these attorneys to defend appellant, in this capital case,

was made by CPT Vitaris: "We are both qualified and certified in accordance with Article 27(b), [UCMJ, 10 USC § 827(b)]." Nothing in the record of trial gives any indication of the training, experience, or abilities of these counsel. The record of trial does not tell us the number of cases each counsel had tried, how long counsel had been admitted to a state bar, or whether either had actually represented a client in a contested felony case involving *voir dire* examination of witnesses, cross-examination, or opening and closing statements. Neither does the record indicate whether either counsel had ever requested a mental health examination of a client or consulted with a forensic psychiatrist; what kinds of investigative assistance or other resources were available; or whether counsel had any knowledge or experience in the use of collateral resources.[1]

Posttrial affidavits tell us more about the two attorneys. For example, from CPT Vitaris, the lead counsel, we learn: "Prior to my representation of SGT Murphy, I never represented or served as associate counsel on a case before a capital sentencing proceeding." Also we learn that he "did not attend any capital training seminars prior to ... [his] representation of SGT Murphy."

CPT Schneller, the assistant defense counsel, was "responsible for the *voir dire* and sentencing portions of the case," two of the most important aspects of any capital case. This division of responsibility was made despite the fact that CPT Schneller had been a defense counsel for only 4 months prior to being "detailed" by CPT Vitaris to assist in appellant's defense. CPT Schneller had no experience in defending capital cases, and he had not received any training in this area of practice.

The record tells us almost nothing about the pretrial investigation or preparation by counsel. Again, through the above-mentioned posttrial affidavits, we learn that both Captains Vitaris and Schneller were "burdened by tasks from the trial defense service." Counsel did not go to North Carolina to investigate the sentencing portion of the case, and no expert witnesses were employed by the defense.

In summary, the record of trial and the posttrial affidavits leave us with only one rational conclusion: SGT Murphy was defended by two attorneys who were neither educated nor experienced in defending capital cases, and they either were not provided the resources or expertise to enable them to overcome these deficiencies, or they did not request same.

In *Loving*, 41 MJ at 300, we expressly declined to mandate that military defense counsel meet the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines) (February 1989). Nor have we held that 18 USC § 3005 applies to courts-martial. That provision of law, as amended in 1994, requires that, in a capital case, the judge shall, "upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases." But both the ABA Guidelines and federal law are instructive. Counsel who are "learned in the law applicable to capital cases" are less likely to provide an inadequate or ineffective defense than those "not learned" in the law.

In looking at defense counsels' performance at trial, we have chosen the route illuminated by the Supreme Court in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *See United States v.*

---

1. An enlightening exchange took place between CPT Schneller (one of appellant's trial defense counsel), Major (MAJ) Pianelli (the trial counsel), and the military judge, involving the use of the telephone by the defense counsel. In summary, the defense counsel was having a difficult time using ordinary military telephone channels to contact witnesses in the United States. In order to use the commercial German telephone system, he had to obtain permission from military authorities. MAJ Pianelli finally authorized CPT Schneller to make calls, although he stated that he did so "knowing full well that I personally would probably have to pay for the call because proper authorization from Fifth Signal Command had not been obtained." It is difficult to believe that a defense counsel in a capital case would have to get permission from the prosecutor to use the telephone, much less that the prosecutor would have to pay for the calls out of his own pocket.

*Loving, supra.* That route compels us to look to the adequacy of counsels' performance, rather than viewing the limited experience of counsel as an inherent deficiency. *See Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Strickland v. Washington* and *United States v. Scott,* both *supra.* Of course, as the ABA Guidelines and 18 USC § 3005 implicitly suggest, and as we have just noted, inexperience—even if not a flaw *per se*—might well lead to inadequate representation. In the final analysis, what we must consider is whether counsels' performance was "deficient" and whether "counsels' errors were so serious as to deprive the defendant of a fair trial," one where the "result [of the trial] is reliable." *Fretwell, supra* at 369, 113 S.Ct. 838.

## The Claims

Appellant's claims of ineffective assistance of counsel are numerous. However, we will discuss only what we feel are the three principal claims, as follows:

1. That appellant was denied "conflict-free" counsel. *See* Issues IV to IX, Appendix.

2. That appellant was denied effective assistance of counsel "because his trial defense counsel failed to investigate the mitigating circumstances of his traumatic family and social history." *See* Issue XVI, Appendix.

3. That appellant received ineffective assistance of counsel because "his trial defense counsel failed to adequately explore mental health evidence." *See* Issue XVII, Appendix.

Related to this last claim is Issue XV, Appendix, wherein appellant claims that he was denied "due process of law because he was denied competent psychiatric assistance in the evaluation, preparation, and presentation of his case."

## The Conflict of Interest Questions

The Government called Private (PVT) French as a witness against appellant. French had been one of appellant's pretrial cell mates in the Mannheim Correctional Facility. While there, appellant engaged in a conversation with an inmate named Offill, in which appellant made certain incriminating statements. PVT French allegedly overheard this conversation and related what he had heard to his lawyer—CPT Schneller. Some weeks later, after CPT Schneller had negotiated a pretrial agreement for PVT French, CPT Schneller formally moved to withdraw from French's case. The military judge who granted the motion to withdraw was the same military judge who presided over appellant's trial. At appellant's trial, French gave his testimony regarding the confession, without objection by appellant's defense counsel. French was not cross-examined concerning the confession. Defense counsel made no effort to impeach the testimony of French, although he had recently been convicted of several crimes involving dishonesty and deceit.

At appellant's trial, CPT Schneller gave no notice to the military judge that there had been dual representation by him of both appellant and French. *See Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Breese,* 11 MJ 17 (CMA 1981). Although it can be argued that the military judge knew, or at a minimum should have known, of the potential conflict of interest between the representation of French and appellant, the military judge likewise made no inquiry on the record regarding the conflict. In any event, neither counsel nor the military judge discussed the potential conflict of interest on the record.

Appellant now claims on appeal that he was prejudiced by this conflict of interest because his counsel did not cross-examine French and did not object to any portion of French's testimony. *See Hoffman v. Leeke,* 903 F.2d 280 (4th Cir.1990); *United States v. Iorizzo,* 786 F.2d 52 (2d Cir.1986).

Appellant correctly contends that he was entitled to have conflict-free counsel. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). He is also correct that the military judge had a *sua sponte* duty to resolve conflict questions on the record. *United States v. Breese, supra.* Not only was he entitled to have the judge sort out conflict-of-interest claims, his attor-

neys had a duty to discuss potential or actual conflicts of interest with him. *See* RCM 901(d)(4); *Henry,* 42 MJ at 237. Our rationale for the rule enunciated in *Breese* was "to disarm future contentions that, by reason of multiple representation, an accused has been deprived of the effective assistance of counsel." 11 MJ at 23. However, multiple representation, even if unexplained in the record of trial, does not, *per se,* mandate reversal. Rather, it creates a presumption that a conflict of interest existed, one that can be rebutted by the actual facts. *Id.* The question is, and remains, whether the multiple representation in a particular setting resulted in an "actual conflict of interest." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

The Court of Military Review carefully considered, but rejected, appellant's conflict-of-interest claims. 36 MJ at 1143–45. However, the court below had no record of any trial or posttrial proceeding on which to base its judgment. *See United States v. Smith,* 36 MJ 455, 457 (CMA 1993). Rather, the court below decided the issue by finding the affidavit of defense counsel more credible than the affidavit of appellant. This method of judging credibility also involves the questionable practice of resolving pure disputes of material fact by mere affidavits, a practice which this Court has recently criticized and condemned. *See United States v. Ginn,* 47 MJ 236 (1997).

Likewise, we have searched the record of trial and the posttrial affidavits, and we have considered the arguments of counsel and the law. Assuming, *arguendo,* that there was a conflict of interest, we conclude that this conflict had no impact on the merits portion of the trial. PVT French's testimony was mostly cumulative. However, he did provide two additional facts, without objection by counsel for appellant.

First, French's testimony sealed appellant's motive for killing his own son:

And he said it was like a voice that was in his mind, telling him to "Go get your other son because he knew you were there, as a witness," so he took his son out of bed and took him into the bathroom and put I

believe it was three or four inches of water in the bathtub, I'm not sure. And then, stuck the little boy's head down in the water and he was drowning him.

Second, French provided helpful testimony that might show why appellant would falsely confess to the killings. This testimony, as follows, was certainly harmless, if not actually helpful:

Q. Did he indicate to you involvement of anyone other than himself?

A: He didn't indicate, sir. He didn't indicate, sir. He did say that ah—I asked him, "When you came to the States, they didn't have any real evidence on you, so why did you confess so easily?" He told me that he was protecting somebody that he loved, but he never did say her name or anything else about it.

Q: Was [appellant's] concern that somebody else would be falsely accused? Was that the indication that he gave?

A: Yes.

 Regardless, because the several confessions by appellant were corroborated by the physical evidence in the case, we conclude that French's motive testimony could not have prejudiced appellant as to the findings of guilt in this case.

 Nevertheless, the question whether this conflict of interest had any impact on the sentencing proceedings remains unresolved. Under our case law, the court below erred by resolving this question solely on the basis of the contradictory affidavits. *United States v. Ginn, supra.* This issue should have and could have been resolved at trial by the simple exercise of CPT Schneller reminding the military judge of the prior representation, and by the judge conducting a suitable inquiry of counsel and appellant on the record.

Nevertheless, as to findings, we are convinced beyond any reasonable doubt that appellant was not prejudiced by the unresolved conflict of interest because of the admission of his multiple confessions and the corroborating physical evidence. However, we cannot say with confidence that French's testimony about why appellant killed his son had

no impact on the members' deliberations on sentence. From this record, we are unable to answer the question whether counsels' failure to resolve the conflict clearly resolved the key questions, (1) did "counsel actively represent[ ] conflicting interests" or (2) was there an "actual conflict of interest [which] adversely affected counsel's performance." *Smith*, 36 MJ at 457. In such a circumstance, we are compelled not to affirm appellant's death sentence without resolving the conflict-of-interest question. *Henry*, *supra* at 238.

### PRETRIAL INVESTIGATION AND THE TRIAL

■ Before turning to appellant's claims of ineffective assistance of counsel, in that defense counsel did not properly prepare or try his case, it is necessary to look at the defense team's pretrial setting and the trial strategy. First and foremost, defense counsel were confronted with a gory and inexplicable family homicide. Appellant's first wife had been killed by repeated blows to the head by a blunt object, ultimately determined to be a hammer, and then drowned in her bathtub. Two small children, a stepson and son, had been violently killed. The killer had left them to decay in a civilian apartment in Germany.

Upon being questioned by police investigators in Alabama, appellant confessed his guilt and subsequently made numerous confessions to many different people. Confronted with this overwhelming evidence, appellant attempted to plead guilty to the charges. The military judge rejected appellant's guilty pleas because the case had been referred as a capital case. RCM 910(a)(1).

Prior to the commencement of proceedings, appellant's counsel requested that appellant be examined by a sanity board. *See* RCM 706. The purpose of such a board is to determine if an accused "lacks capacity to stand trial" or "lacked mental responsibility for any offense charged." Lack of mental responsibility is a complete defense under military law. Article 50a(a), UCMJ, 10 USC § 850a(a), states:

It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.

The psychiatric board reported that appellant did not suffer from a severe mental disease or defect, and that he was able to "cooperate intelligently in the defense."

Article 45(b), UCMJ, 10 USC § 845(b), and the Rules for Courts–Martial will not allow a capital defendant to plead guilty. Thus, appellant's defense team attempted to mount a defense to the capital murder charges. In light of the numerous confessions, some with inconsistencies, the defense tried to create the belief that perhaps the confessions were untrue and the killings were actually committed by appellant's second wife, Beate, a person whom appellant would try to protect with his false confessions. The defense strategy obviously did not work.

The sentencing case was handled by CPT Schneller. He did not travel to the United States in order to conduct personal interviews with witnesses in appellant's hometown of Clinton, North Carolina. Instead, he attempted to develop an extenuation and mitigation case by correspondence and telephone. The pretrial effort is best summed up by CPT Schneller in an affidavit of January 28, 1993. There, he stated:

I obtained a list of witnesses from SGT Murphy and also sent letters out to many friends and relatives in SGT Murphy's home town. I . . . received responses to these letters and from the responses I made phone calls back to individuals inquiring into Murphy's life history. Based on the interviews, I selected the individuals I thought would be most helpful to our case and requested that they be flown over at government expense. Throughout my interviews there was never any mention of abuse or mistreatment against SGT Murphy or his mother. And further, SGT Murphy never gave any of this information to me.

As a result of this preparation, the defense offered evidence of SGT Murphy's previous

good character; the fact that he was not a violent man; that he was a good soldier; and that he desired to rehabilitate his life. *See* 36 MJ at 1146. SGT Murphy gave an unsworn statement in which he asked the members to spare his life, and he expressed remorse. SGT Murphy also told the members that he had tried to plead guilty.

CPT Schneller delivered a well-prepared and thoughtful summation for the members to consider, including reminding each member that it was a personal decision to return a death sentence. In spite of defense counsels' efforts, the court-martial returned a sentence including death.

The Army Court of Military Review blessed this sentencing effort by characterizing it as "trial defense counsel's tactical judgment." *Id.* In some cases, this effort might well satisfy the *Strickland* standard for adequate representation. What follows in this opinion, however, demonstrates that a capital case—or at least this capital case—is not "ordinary," and counsels' inexperience in this sort of litigation is a factor that contributes to our ultimate lack of confidence in the reliability of the result: a judgment of death. We have no quarrel with the Army Court regarding the obligation of an appellate court not to second-guess tactical judgments. Here, however, counsels' lack of training and experience contributed to questionable tactical judgments, leading us to the ultimate conclusion that there are no tactical decisions to second-guess.

### POSTTRIAL CLAIMS REGARDING MENTAL RESPONSIBILITY:

#### THE FACTS

While appellant's case was pending before the Army Court of Military Review, but about 5 years after his initial conviction, appellant was successful in obtaining funding from the Judge Advocate General of the Army to employ the services of an expert to conduct a posttrial social history. The investigation was completed by Ms. Jill Miller, a forensic social worker, in April 1993, just weeks after the Court of Military Review issued its opinion affirming appellant's conviction and sentence to death. Although appellant had asked the Army Court to defer its decision until after the investigation was complete, that court refused to continue the case. 36 MJ at 1149–54. In addition to the information produced directly by Ms. Miller's investigation, the results of this investigation paved the way for appellant to develop considerable new factual matters through affidavits filed with this Court. The unfortunate result of the Army Court's unwillingness to delay its March 1993 decision, however, is that none of this "new matter" has been tested in an evidentiary hearing, and most of it is unchallenged by government evidence. Thus this Court—a non-factfinding court—is called upon to evaluate appellant's claim that he is entitled to a new trial because of substantial evidence which, if convincing, might well cause a different trial result.

Complementing the evidence assembled by Ms. Miller, appellant submitted additional affidavits, including several by medical specialists. Appellant retained the services of Dr. William A. O'Connor, a clinical psychologist. Dr. O'Connor administered clinical tests to appellant, conducted interviews with appellant, and examined much of the evidence gathered by the forensic sociologist. Dr. O'Connor concluded that SGT Murphy did,

> at the time of the alleged offense, suffer from a personality disorder and other psychological dysfunctions which would have affected his thoughts or actions. There are indications of minimal or slight cognitive and neuropsychological dysfunction; however, the primary origin or cause of the personality disorder with associated post-traumatic features can be specified based on clinical interview and records, as well as test results indicating persistent and severe traumatic childhood abuse.

\* \* \* \* \* \*

> [T]he Sanity Board hearings were not correct or based on adequate and required assessment methods.

Dr. William H. Carson, a professor of psychiatry at the Medical University of South Carolina, also reviewed appellant's case and the psychological and sociological evidence. He concurred with Dr. O'Connor's findings.

Appellant was also examined by Dr. Edward C. Kirby, a psychiatrist with over 33 years of practice. Dr. Kirby concluded that SGT Murphy's severe mental disease or defect rendered him unable to form the requisite intent to commit premeditated murder. Importantly, Dr. Kirby also concluded that SGT Murphy was unable to appreciate the nature and quality or wrongfulness of his acts, and moreover, that he could not have conformed his conduct to the requirements of the law at the time of the incident in question.

Appellant also offers the affidavit of Dr. James R. Merikangas, M.D., a clinical professor of psychiatry at Yale University School of Medicine, who concluded that SGT Murphy suffered from a severe mental illness and that his low intellectual functioning was consistent with organic brain damage, perhaps as a result of fetal alcohol syndrome.

Appellant then ties his evidence together with the opinion of Dr. Jon M. Aase, M.D., a pediatrician, who concluded that the amount of alcohol allegedly consumed by appellant's mother during her pregnancy with appellant was sufficient to put him at risk of organic brain damage that would persist throughout his life. Dr. Aase also concluded that further examination for fetal alcohol syndrome was clinically indicated.

In summary, appellant's unrebutted posttrial submissions, at the very least, raise the question of whether a reasonable finder of fact, armed with this evidence, would come to the same conclusions that the court-martial did as to the findings and sentence. *See United States v. Dock*, 26 MJ 620 (ACMR 1988).

## THE LAW

Article 73, UCMJ, 10 USC § 873, permits a military member to petition for a new trial "[a]t any time within two years after approval ... of a court-martial sentence." RCM 1210(f) provides the procedures and grounds for such relief, as follows:

(f) *Grounds for new trial.*

\*　　\*　　\*　　\*　　\*　　\*

(2) *Newly discovered evidence.* A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

Because the "newly discovered evidence" in this case came many years after the expiration of the 2–year time period authorized by Article 73, appellant has not based his plea for relief on a petition for new trial, and he has not sought relief utilizing the extraordinary writ authority of the Court. *See* All Writs Act, 28 USC § 1651(a). Rather, appellant has sought relief on direct appeal claiming constitutional deprivations. For example, appellant claims that he was denied the assistance of psychiatric experts in the preparation of his defense, relying on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). He also seeks to have his posttrial evidence viewed through a kaleidoscope of ineffective-assistance-of-counsel claims. Specifically, as mentioned earlier, he focuses on an inadequate investigation into his sociological background and possible explanations for his behavior.

We are not helpless, however, to render justice when due. One continuous theme is found throughout the death-penalty cases handed down by the Supreme Court over the last 30 years. That theme is reliability of result. Thus, the *sine qua non* of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); and *Lockhart v. Fretwell; Strickland v. Washington;* and *Ake v. Oklahoma*, all *supra*, is that the Supreme Court has insisted there be a proper functioning of the adver-

sarial system. A fair reading of these cases demonstrates that, in order for the adversarial system to work properly, the key ingredients are competent counsel; full and fair opportunity to present exculpatory evidence; individualized sentencing procedures; fair opportunity to obtain the services of experts; and fair and impartial judges and juries.

In this case, therefore, we will test the result obtained at trial against the entire record before us to determine whether we can affirm appellant's convictions and sentence. We must be satisfied that the adversarial process has worked, and that appellant has had a fair and complete trial.

As we have done in other capital cases, we use a standard of review which, in our judgment, comports with our obligation to review "all cases in which the sentence, as affirmed by a Court of Criminal Appeals, extends to death." Art. 67(a)(1). We will follow our statutory mandate that "[a] finding or sentence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Art. 59(a), UCMJ, 10 USC § 859(a). But in so doing, we will ensure that fundamental notions of due process, full and fair hearings, competent counsel, and above all, a "reliable result," are part of the equation. In the final analysis, we have heretofore examined, and shall continue to examine, the record of trial in capital cases to satisfy ourselves that the military member has received a fair trial. *See United States v. Loving, supra* (all issues fully considered); *United States v. Curtis,* 32 MJ 252 (CMA 1991); 33 MJ 101 (CMA 1991); 46 MJ 129 (1997) (reversed on reconsideration).

With this standard of review, we turn to the case at hand. We are immediately confronted with two questions based upon the "newly discovered" psychiatric evidence. Historically, and when not restrained by the 2–year limitation of Article 73, we have given preferential treatment to the question of mental responsibility when raised for the first time on appeal. *United States v. Young,* 43 MJ 196 (1995), relying on *United States v. Van Tassel,* 38 MJ 91 (CMA 1993);

*United States v. Lilly,* 25 MJ 403 (CMA 1988). Although there has been some disagreement as to the correct standard of review, there clearly is agreement that, if the requirements of RCM 1210(f)(2) are present, the accused is entitled to a new trial. *Compare United States v. Van Tassel with United States v. Young,* both *supra; see also United States v. Dock, supra* (compare majority opinion with dissenting opinion). As stated earlier, we cannot review appellant's claims here under RCM 1210, because he filed no petition for a new trial within the statutory time limit, and regardless, it is doubtful that he could meet the "due-diligence" requirement of the rule. *See United States v. Fisiorek,* 43 MJ 244, 249 (1995) (Crawford, J., dissenting). Nevertheless, the ultimate requirement found in RCM 1210(f)(2)(C) provides us with a clear rule for testing whether the result obtained in the court-martial proceeding is a reliable result. That test is whether

> [t]he newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

*Id.*

We have considered all of the affidavits and new evidence obtained by appellant as a result of the work of his forensic sociologist. Likewise, we have considered all of the affidavits and statements of the various psychologists, psychiatrists, and physicians. We do not know if what they say is indeed the true state of affairs, because the evidence has not been tested in the crucible of an adversarial proceeding.

Thus, when the dust settles on this record of trial, as supplemented by the substantial number of posttrial affidavits, we find ourselves in the following position. First, we are satisfied that appellant did not get a full and fair sentencing hearing. There are too many questions arising out of the conflict of interest issue, the potential mitigating effect of the posttrial evidence as to his mental status, and the lack of training and experience of his trial defense counsel in the de-

fense of capital cases to allow us to affirm a death sentence here.

On the other hand, we are uncertain as to the impact of the posttrial information on the findings of guilt. There is substantial evidence of record that contradicts appellant's claims that he could not form the requisite premeditation required for the Government to prove his guilt of murder under Art. 118(1).

Nonetheless, we must recognize that the posttrial information, as contained in the barrage of affidavits filed with this Court, has never been tested by cross-examination or by the contrary testimony of government witnesses. *See United States v. Van Tassel, supra.* Therefore, what remedy do we provide appellant? The remedy we adjudge meets the statutory mandate of review prescribed by Article 59(a).

We are further cognizant of Judge Sullivan's admonition in his dissenting opinion in *United States v. Young,* to the effect that the proper court for determining these questions is the Court of Criminal Appeals. 43 MJ at 199; *but see United States v. Ginn, supra.* An appellant is entitled to an evidentiary hearing if his or her posttrial affidavits raise material questions of fact that might give rise to relief. In any event, we will leave it up to the Army Court of Criminal Appeals to determine if it can resolve this case on the evidence before it, or whether a new fact hearing shall be necessary. Article 66, UCMJ, 10 USC § 866(1994).

The decision of the United States Army Court of Military Review (36 MJ 1137) is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to the United States Army Court of Criminal Appeals for further review. That court may: (1) Review the new evidence to determine if a different verdict as to findings might reasonably result in light of posttrial evidence, *United States v. Van Tassel, supra;* (2) If it determines that the record before it is inadequate to resolve the factual issues regarding findings, it may order a *DuBay* hearing to consider the factual issues raised on appeal as to the findings; (3) If it determines that a different verdict would not rea-

sonably result as to findings, then it may either affirm appellant's sentence only as to life imprisonment and accessory penalties, or it may order a rehearing as to the death sentence. *Curtis,* 46 MJ at 130; (4) If it determines that a different verdict on findings might reasonably result, then it shall order a rehearing on findings and sentence; (5) If on remand the Court of Criminal Appeals determines that further review under Article 66 is impracticable, then in the interest of judicial economy, it may order forthwith a rehearing on findings and sentence.

APPENDIX

ISSUES PRESENTED

I

MILITARY DUE PROCESS AND ARTICLES 66 AND 67, UCMJ, REQUIRE THE COURT OF MILITARY APPEALS AND THE COURTS OF MILITARY REVIEW TO REVIEW ALL CAPITAL CASES *IN FAVOREM VITAE,* SINCE CAPITAL LITIGATION IS IN ITS INFANCY IN THE MILITARY JUSTICE SYSTEM AND TRIAL AND APPELLATE DEFENSE COUNSEL LACK THE TRAINING AND EXPERIENCE NECESSARY TO PRESERVE THE RECORD OF ALL ISSUES AND PREVENT APPLICATION OF WAIVER.

II

THE MILITARY JUSTICE SYSTEM SHOULD TREAT ISSUES IN DEATH PENALTY CASES IN THE SAME MANNER AS IT DOES COMMAND INFLUENCE AND MANDATE *DE NOVO* REVIEW AT ALL LEVELS OF APPEAL.

III

A FACTFINDING COURT OF MILITARY REVIEW MUST UNANIMOUSLY AGREE ON BOTH THE FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE AND MUST APPLY A POLICY OF *IN FAVOREM VITAE.*

## IV

SERGEANT MURPHY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS DEFENSE TEAM COULD NOT PROVIDE HIM WITH CONFLICT–FREE REPRESENTATION.

## V

THE MILITARY JUDGE ERRED BY FAILING TO INQUIRE INTO THE EXISTENCE OF A CONFLICT OF INTEREST BASED ON DEFENSE COUNSEL'S DUAL REPRESENTATION OF SERGEANT MURPHY AND A GOVERNMENT "SNITCH" WHO TESTIFIED AGAINST HIM.

## VI

SERGEANT MURPHY'S DEFENSE COUNSEL COMMITTED REVERSIBLE ERROR BY FAILING TO INFORM THE TRIAL COURT IN WRITING OF A CONFLICT OF INTEREST BETWEEN REPRESENTATION OF SERGEANT MURPHY AND A GOVERNMENT "SNITCH" AND BY FAILING TO OBTAIN SERGEANT MURPHY'S WAIVER OF CONFLICT–FREE REPRESENTATION ON THE RECORD.

## VII

THE COURT OF MILITARY REVIEW ERRED BY FAILING TO RETURN THIS CASE FOR A *DUBAY* HEARING TO DETERMINE WHETHER A CONFLICT OF INTEREST EXISTED.

## VIII

A *DUBAY* REHEARING IS NECESSARY TO EXPLORE THE NATURE, EXTENT, AND EFFECT OF A CONFLICT OF INTEREST CAUSED BY ONE OF SERGEANT MURPHY'S TRIAL DEFENSE COUNSEL'S FORMER REPRESENTATION OF ONE OF THE DECEDENTS.

## IX

BECAUSE ONE OF SERGEANT MURPHY'S APPELLATE ATTORNEYS REPRESENTED SERGEANT MURPHY AND THE "SNITCH" SIMULTANEOUSLY, CONFLICTED REPRESENTATION HAS PERSISTED INTO SERGEANT MURPHY'S APPEAL.

## X

THE UNITED STATES LACKED JURISDICTION TO COURT–MARTIAL SERGEANT MURPHY FOR SPECIFICATIONS 1 AND 2 OF CHARGE I.

## XI

SERGEANT MURPHY WAS DENIED HIS FIFTH AND EIGHTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AS A RESULT OF THE UNITED STATES' FAILURE TO PROVIDE ACCURATE JURISDICTIONAL INFORMATION TO THE FEDERAL REPUBLIC OF GERMANY.

## XII

THE EXISTENCE OF THE LOGAN ACT AND USAREUR REGULATION 550–56 DENIED SERGEANT MURPHY HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, EQUAL PROTECTION, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

## XIII

SERGEANT MURPHY'S TRIAL DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO: (1) CHALLENGE THE CONSTITUTIONALITY OF THE LOGAN ACT AND USAREUR REGULATION 550–56; (2) REQUEST THAT THE MILITARY JUDGE ORDER THAT SERGEANT MURPHY BE PROVIDED WITH A GERMAN ATTORNEY WHO COULD PROPERLY PROTECT HIS

RIGHTS CONCERNING JURISDICTION; AND (3) ENSURE THAT THE GERMAN GOVERNMENT WOULD COMPLY WITH ITS INTERNATIONAL OBLIGATION TO SUPPORT THE HUMAN RIGHTS OF PEOPLE WITHIN ITS TERRITORY AS REQUIRED BY THE EUROPEAN CONVENTION.

## XIV

SERGEANT MURPHY WAS DENIED HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE, CONFRONTATION, A FAIR TRIAL, AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT AT ALL STAGES OF THE PROCEEDINGS DUE TO REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT.

## XV

SERGEANT MURPHY WAS CONVICTED WITHOUT DUE PROCESS OF LAW BECAUSE HE WAS DENIED COMPETENT PSYCHIATRIC ASSISTANCE IN THE EVALUATION, PREPARATION, AND PRESENTATION OF HIS CASE.

## XVI

SERGEANT MURPHY WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL DEFENSE COUNSEL FAILED TO INVESTIGATE THE MITIGATING CIRCUMSTANCES OF HIS TRAUMATIC FAMILY AND SOCIAL HISTORY.

## XVII

SERGEANT MURPHY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL DEFENSE COUNSEL FAILED TO ADEQUATELY EXPLORE MENTAL HEALTH EVIDENCE.

## XVIII

TRIAL DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO ADEQUATELY INTERVIEW AND PREPARE TO CROSS-EXAMINE GOVERNMENT WITNESSES AND PREPARE DEFENSE WITNESSES.

## XIX

APPELLANT'S TRIAL DEFENSE COUNSEL CONDUCTED AN INADEQUATE AND INEFFECTIVE *VOIR DIRE,* THEREBY DENYING APPELLANT HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AN IMPARTIAL PANEL, DUE PROCESS, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

## XX

SERGEANT MURPHY'S TRIAL DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSIBILITY OF PROSECUTION EXHIBITS 19, 20, 26, 27, AND 30–52.

## XXI

TRIAL DEFENSE COUNSEL WERE INEFFECTIVE BY FAILING TO OBJECT WHEN THE GOVERNMENT ADDRESSED DURING ITS OPENING STATEMENT AND PRESENTED TESTIMONY ON THE MERITS CONCERNING IRRELEVANT AND HIGHLY PREJUDICIAL VICTIM IMPACT EVIDENCE.

## XXII

SERGEANT MURPHY WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL DEFENSE COUNSEL FAILED TO OBJECT TO THE ADMISSIBILITY OF BOTH AN ORAL STATEMENT ALLEGEDLY MADE BY APPELLANT TO SA WOODALL AND A WRITTEN STATE-

MENT PRESENTED AS PROSECUTION EXHIBIT 60 BECAUSE THEY WERE OBTAINED IN VIOLATION OF ARTICLE 31(b), UCMJ, AS SERGEANT MURPHY WAS NOT ADVISED THAT HE WAS SUSPECTED OF FALSE SWEARING.

## XXIII

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL DEFENSE COUNSEL FAILED TO OBJECT TO THE ADMISSIBILITY OF THE STATEMENTS APPELLANT ALLEGEDLY MADE TO SERGEANT FIRST CLASS MAREK AND STAFF SERGEANT LIPSCOMB AS THE STATEMENTS WERE MADE WITHOUT APPELLANT HAVING BEEN ADVISED OF HIS RIGHTS UNDER ARTICLE 31(b), UCMJ.

## XXIV

SERGEANT MURPHY WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL DEFENSE COUNSEL FAILED TO INTERVIEW AND PRESENT AVAILABLE MILITARY WITNESSES AND MILITARY RECORDS.

## XXV

SERGEANT MURPHY WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL DEFENSE COUNSEL FAILED TO SEEK, OBTAIN, AND PRESENT FAVORABLE CLEMENCY MATTERS TO THE CONVENING AUTHORITY.

## XXVI

THE MILITARY JUDGE ERRED WHEN HE ADMITTED, OVER DEFENSE OBJECTION, GRUESOME PHOTOGRAPHS OF THE DECEDENTS.

## XXVII

THE MILITARY JUDGE EFFECTIVELY PRECLUDED THE PANEL MEMBERS FROM CONSIDERING SERGEANT MURPHY'S DISADVANTAGED BACKGROUND, THEREBY DENYING HIM HIS RIGHTS TO CONSTITUTIONAL AND MILITARY DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

## XXVIII

SERGEANT MURPHY IS ENTITLED TO A REHEARING BECAUSE THE MILITARY JUDGE IMPROPERLY INSTRUCTED THE MEMBERS ON VOTING PROCEDURES, THEREBY DEPRIVING APPELLANT OF THE SUBSTANTIAL PROCEDURAL PROTECTIONS OF ARTICLE 51(a), UCMJ, ON FINDINGS AND SENTENCE.

## XXIX

THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT ON SENTENCING AS TO THE MEANING OF THE TERM "SUBSTANTIALLY OUTWEIGHED" AND HOW IT APPLIES TO THE RELATIONSHIP BETWEEN MITIGATING CIRCUMSTANCES AND AGGRAVATING FACTORS, AND FAILING TO DEFINE AND EXPLAIN THE RELATIONSHIP BETWEEN CIRCUMSTANCES AND FACTORS.

## XXX

THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS, AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINED THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES WERE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING CIRCUMSTANCES, EACH

MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE.

## XXXI

THE MILITARY JUDGE ABANDONED HIS IMPARTIAL ROLE AND BECAME AN ADVOCATE FOR THE GOVERNMENT, THEREBY DENYING SERGEANT MURPHY A FAIR TRIAL.

## XXXII

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE PERMITTED THE GOVERNMENT, OVER DEFENSE OBJECTION, TO INTRODUCE TESTIMONY ON SENTENCING CONCERNING THE PERSONAL CHARACTERISTICS OF A DECEDENT.

## XXXIII

SERGEANT MURPHY DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL OR HIS ARTICLE 38(b)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE THE MILITARY JUDGE MISLED SERGEANT MURPHY BY STATING THAT HIS COUNSEL WERE QUALIFIED WHEN NEITHER COUNSEL HAD CAPITAL TRAINING OR RESOURCE MATERIALS TO ASSIST THEM.

## XXXIV

THE MILITARY JUDGE'S PERSISTENT INSTRUCTIONS TO SERGEANT MURPHY'S FAMILY AND FRIENDS WHO WERE WATCHING THE TRIAL THAT THEY COULD NOT DISPLAY ANY EMOTION AT ALL WHILE IN THE COURTROOM IMPROPERLY CAUSED THEM TO WITHHOLD THEIR EMOTIONS AT ALL TIMES, EVEN WHILE THEY TESTIFIED, AND THEREBY PREVENTED THE PANEL FROM SEEING THE TRUE FEELINGS OF SERGEANT MURPHY'S MITIGATION WITNESSES, DIMINISHING THE IMPACT OF THEIR TESTIMONY.

## XXXV

THE MILITARY DEATH PENALTY SCHEME IS INVALID DUE TO *FURMAN V. GEORGIA*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), AND THE SEPARATION OF POWERS DOCTRINE.

## XXXVI

SERGEANT MURPHY'S CONVICTION AND DEATH SENTENCE ARE INVALID BECAUSE THEY WERE IMPOSED BY A PANEL OF FEWER THAN TWELVE LAY PERSONS.

## XXXVII

THE STANDARDLESS PROPORTIONALITY REVIEW CONDUCTED BY THE ARMY COURT OF MILITARY REVIEW IS FUNDAMENTALLY FLAWED, DEPRIVES THIS COURT OF MEANINGFUL APPELLATE REVIEW, AND VIOLATED SERGEANT MURPHY'S CONSTITUTIONAL AND MILITARY RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

## XXXVIII

SERGEANT MURPHY'S DEATH SENTENCE IS DISPROPORTIONATE TO OTHER SIMILARLY SITUATED DEATH–ELIGIBLE HOMICIDES.

## XXXIX

THE PREDOMINANCE OF MISLEADING LANGUAGE IN THE REASONABLE DOUBT INSTRUCTIONS GIVEN BY THE MILITARY JUDGE FOR FINDINGS AND SENTENCING CREATED A HIGHER DEGREE OF DOUBT THAN IS REQUIRED UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.

## XL

SERGEANT MURPHY'S DEATH SENTENCE MUST BE SET ASIDE AND ONLY A LIFE SENTENCE AFFIRMED BECAUSE SERGEANT MURPHY'S DEATH SENTENCE WAS IMPOSED AS A MATTER OF LAW IN A PROCEDURALLY INCORRECT MANNER BECAUSE THE OPTION OF IMPOSING A SENTENCE OF LIFE IMPRISONMENT WAS NOT GIVEN ITS DUE CONSIDERATION.

## XLI

SERGEANT MURPHY'S DEATH SENTENCE MUST BE SET ASIDE AND ONLY A LIFE SENTENCE AFFIRMED BECAUSE THE DEATH SENTENCE WAS IMPOSED AS A MATTER OF LAW IN A PROCEDURALLY INCORRECT MANNER BECAUSE THE PANEL FAILED TO VOTE ON WHETHER "ANY EXTENUATING OR MITIGATING CIRCUMSTANCES [WERE] SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING CIRCUMSTANCES" AND THEREFORE FAILED TO MEET THE REQUIREMENT OF RCM 1004(b)(4)(C) THAT THERE BE A CONCURRENCE BY ALL THE MEMBERS ON THE MATTER.

## XLII

SERGEANT MURPHY'S DEATH SENTENCE MUST BE SET ASIDE AND ONLY A LIFE SENTENCE AFFIRMED BECAUSE THE DEATH SENTENCE WAS IMPOSED AS A MATTER OF LAW IN A PROCEDURALLY INCORRECT MANNER BECAUSE THE PANEL DID NOT PROPOSE SENTENCES IN WRITING BUT DID SO ORALLY.

## XLIII

SERGEANT MURPHY WAS CONVICTED AND SENTENCED TO DEATH IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BECAUSE THE CONVICTIONS AND SENTENCE WERE RENDERED UPON MISINFORMATION CONCERNING HIS CULPABILITY AND MORAL BLAMEWORTHINESS.

## XLIV

SERGEANT MURPHY WAS DENIED HIS RIGHT TO AN IMPARTIAL JURY BY THE ACCEPTED PRACTICE IN THE MILITARY OF ALLOWING PANEL MEMBERS TO INTERROGATE WITNESSES.

## XLV

THE STAFF JUDGE ADVOCATE'S SPECIFIC INSERTION AND NOTATION OF RACIAL IDENTIFIERS FOR SERGEANT MURPHY AND A PANEL MEMBER INTO THE CLEMENCY PROCESS VIOLATED SERGEANT MURPHY'S RIGHTS TO EQUAL PROTECTION AND DUE PROCESS.

## XLVI

RCM 1004 FAILS TO INCORPORATE CONGRESSIONALLY MANDATED PROTECTION TO PREVENT RACIALLY MOTIVATED IMPOSITION OF THE DEATH PENALTY IN VIOLATION OF ARTICLE 55, UCMJ, AND THE EIGHTH AMENDMENT TO THE CONSTITUTION.

## XLVII

THE MILITARY JUDGE COMMITTED PLAIN ERROR WHEN HE FAILED TO *SUA SPONTE* INSTRUCT THE PANEL MEMBERS THAT RACE COULD NOT BE CONSIDERED AS A FACTOR IN THE SENTENCING PROCESS.

## XLVIII

THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE JUROR WITHOUT CAUSE, IS UNNECESSARY AND SUBJECT TO

ABUSE IN ITS APPLICATION AND WAS ABUSED IN SERGEANT MURPHY'S CASE.

## XLIX

THE PRETRIAL ADVICE IN SERGEANT MURPHY'S CASE WAS DEFECTIVE BECAUSE THE STAFF JUDGE ADVOCATE FAILED TO ENUMERATE ANY MITIGATING CIRCUMSTANCES THE CONVENING AUTHORITY COULD BALANCE AGAINST THE AGGRAVATING CIRCUMSTANCES TO MAKE AN INFORMED DECISION WHETHER TO REFER THIS CASE CAPITAL.

## L

THE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM PARTICIPATING IN THE PROCEEDINGS AFTER THE INITIAL PRETRIAL ADVICE AND CAPITAL REFERRAL WERE CHALLENGED AS DEFECTIVE.

## LI

THE CONVENING AUTHORITY WAS DISQUALIFIED FROM PARTICIPATING IN THE PROCEEDINGS AFTER THE INITIAL PRETRIAL ADVICE AND CAPITAL REFERRAL WERE CHALLENGED AS DEFECTIVE.

## LII

THE FINDINGS MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING CIRCUMSTANCES FOUND BY THE MEMBERS.

## LIII

THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING CIRCUMSTANCES TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING OR MITIGATING CIR-

CUMSTANCES IS IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN THAT THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT." *SEE ALSO* ARTICLE 59(a), UCMJ.

## LIV

THE AGGRAVATING FACTOR STATED IN RCM 1004(c)(7)(I) IS VAGUE, FAILS TO SUFFICIENTLY CLARIFY THE FACTOR INVOLVED, DOES NOT NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY, AND IS THEREFORE INVALID UNDER THE EIGHTH AMENDMENT TO THE CONSTITUTION.

## LV

COURT–MARTIAL PROCEDURES DENIED SERGEANT MURPHY HIS ARTICLE III RIGHT TO A JURY TRIAL.

## LVI

ARTICLE 18, UCMJ, AND RCM 201(f)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEES OF DUE PROCESS AND A RELIABLE VERDICT.

## LVII

RCM 1004'S PROHIBITION AGAINST GUILTY PLEAS IN CAPITAL CASES DEPRIVED SERGEANT MURPHY OF A CRITICAL MITIGATING FACTOR AND CAUSED OTHER IRREPARABLE PREJUDICE.

## LVIII

SERGEANT MURPHY IS ENTITLED TO REPRESENTATION BY QUALIFIED AND COMPETENT CAPITAL COUNSEL AND TO UNINTERRUPTED CONTINUITY OF COUNSEL UNAFFECTED BY PEACETIME MILITARY PERSONNEL DECISIONS.

## LIX

NEITHER THIS COURT NOR THE ARMY COURT HAS THE JURISDICTION OR THE AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS–MARTIAL AND THE UNIFORM CODE OF MILITARY JUSTICE BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WHICH HAS THE POWER TO CHECK CONGRESS AND THE EXECUTIVE UNDER *MARBURY V. MADISON,* 5 U.S. (1 CRANCH) 137, 2 L.Ed. 60 (1803).

## LX

THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BY FAILING TO INSTRUCT THE PANEL MEMBERS THAT THE ONLY OFFENSE FOR WHICH SERGEANT MURPHY COULD BE SENTENCED TO DIE WAS PREMEDITATED MURDER AND THAT SERGEANT MURPHY COULD NOT BE SENTENCED TO DIE ON THE BASIS OF THE AGGREGATE OR CUMULATIVE EFFECT OF ALL THE OFFENSES.

## LXI

THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER ALLOWING DIFFERENTIAL TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ.

## LXII

THE MILITARY JUDGE'S INSTRUCTIONS BLURRED ANY DISTINCTION BETWEEN THE OFFENSES OF PREMEDITATED AND UNPREMEDITATED MURDER AND DELETED THE REQUIRED ELEMENT OF "PREMEDITATION" FROM THE OFFENSE OF PREMEDITATED MURDER IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ.

## LXIII

THE MILITARY JUDGE'S INSTRUCTIONS RESTRICTED FREE CONSIDERATION OF THE EVIDENCE BY REQUIRING THE MEMBERS TO VOTE ON THE MOST SERIOUS OFFENSE FIRST.

## LXIV

THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS ESTABLISHED THE SENIOR MEMBER'S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PROCESS AND DENIED SERGEANT MURPHY DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL CONSIDERATION OF THE EVIDENCE BY THE MEMBERS.

## LXV

THE MILITARY JUDGE'S INSTRUCTION THAT "YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING FACTORS" DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS · FINDING MUST BE UNANIMOUS.

## LXVI

THE IMPOSITION OF THE DEATH PENALTY VIOLATED SERGEANT MURPHY'S RIGHT TO EQUAL PROTECTION UNDER THE FIFTH AMENDMENT BECAUSE RCM 1004 SUBJECTED SERGEANT MURPHY, AS A MEMBER OF THE ARMED FORCES, TO A PENALTY WHICH IS NOT OTHERWISE AVAILABLE UNDER THE CRIMINAL CODE OF THE

UNITED STATES FOR IDENTICAL CRIMINAL CONDUCT.

## LXVII

THE TRIAL COUNSEL COMMITTED PROSECUTORIAL MISCONDUCT BY PRESENTING CONTRARY ARGUMENTS ON THE MERITS AND SENTENCING CONCERNING WHETHER AN AGGRAVATING CIRCUMSTANCE APPLIED IN THIS CASE.

## LXVIII

A *DUBAY* HEARING IS NECESSARY TO EXPLORE THE NATURE, EXTENT, AND EFFECT OF A CONFLICT OF INTEREST CAUSED BY ONE OF SERGEANT MURPHY'S TRIAL DEFENSE COUNSEL'S FORMER REPRESENTATION OF ONE OF THE DECEDENTS.

## LXIX

THE SECRETARY OF STATE AND OTHER OFFICIALS AT THE DEPARTMENT OF STATE, AS AGENTS AND REPRESENTATIVES OF THE PRESIDENT OF THE UNITED STATES, GUARANTEED HIGH OFFICIALS OF THE GERMAN GOVERNMENT THAT THE DEATH SENTENCE WILL BE COMMUTED IN APPELLANT'S CASE AND GAVE A MINISTERIAL COMMITMENT THAT CLEMENCY WOULD BE RECOMMENDED.

## LXX

APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WERE DENIED BY THE TRIAL COUNSELS', MILITARY JUDGE'S, AND PANEL'S RUSH TO COMPLETE THE APPELLANT'S COURT–MARTIAL.

## LXXI

THE MILITARY JUDGE ERRED BY INSTRUCTING THE PANEL MEMBERS THAT THEY COULD NOT CONSIDER THAT THE INCIDENT IN QUESTION WAS PRECEDED BY A HEATED ARGUMENT.

## LXXII

SERGEANT MURPHY'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPITAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER.

## LXXIII

SERGEANT MURPHY WAS DENIED HIS RIGHTS TO EQUAL PROTECTION, DUE PROCESS, THE EFFECTIVE ASSISTANCE OF COUNSEL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT GUARANTEED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE CONSTITUTION WHEN HE WAS REPRESENTED ON REMAND TO THE ARMY COURT BY APPELLATE COUNSEL WHO WERE BEING SENIOR–RATED BY THE OFFICER WHO RECOMMENDED A CAPITAL REFERRAL, APPROVAL OF THE FINDINGS, AND THE DEATH SENTENCE IN SERGEANT MURPHY'S CASE.

## LXXIV

MILITARY DUE PROCESS AND FUNDAMENTAL NOTIONS OF FAIRNESS REQUIRE THAT EACH MEMBER OF THE COURT–MARTIAL SIGN HIS OR HER NAME TO THE DEATH–SENTENCE WORKSHEET OR THAT THE CONDEMNED ACCUSED BE AFFORDED THE RIGHT AND OPPORTUNITY TO POLL THE MEMBERS.

## LXXV

THE CAPITAL SENTENCING PROCEDURE IN THE MILITARY IS UNCONSTITUTIONAL BECAUSE THE MILI-

TARY JUDGE LACKS THE POWER TO ADJUST OR SUSPEND A SENTENCE OF DEATH WHICH IS IMPROPERLY IMPOSED.

## LXXVI

COURT–MARTIAL PROCEDURES DENIED SERGEANT MURPHY OF HIS SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND AN IMPARTIAL CROSS–SECTION OF THE COMMUNITY.

## LXXVII

SERGEANT MURPHY'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.

## LXXVIII

SERGEANT MURPHY'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE ARMY COURT'S REQUIREMENT THAT APPELLATE DEFENSE COUNSEL INVESTIGATE, RESEARCH, BRIEF, FILE, AND ARGUE ISSUES GERMANE TO HIS CASE WITHOUT HAVING ALL THE AVAILABLE RELEVANT MITIGATION EVIDENCE.

## LXXIX

THE ARMY COURT ERRED BY DECIDING AND ISSUING AN OPINION IN THIS CASE WITHOUT WAITING FOR THE AVAILABLE RELEVANT MITIGATION EVIDENCE.

## LXXX

SERGEANT MURPHY'S DEATH SENTENCE IS INVALID UNDER THE FIFTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION AND ARTICLE 55, UCMJ, BECAUSE THE SENTENCING PANEL WAS IMPROPERLY PERMITTED TO CONSIDER "LACK OF REHABILITATION,"

"PRESERVATION OF GOOD ORDER AND DISCIPLINE," AND SPECIFIC DETERRENCE IN SENTENCING DELIBERATIONS.

## LXXXI

THE GOVERNMENT'S FAILURE TO GIVE NOTICE OF THE AGGRAVATING CIRCUMSTANCES IT INTENDED TO PROVE, OTHER THAN THOSE SPECIFICALLY LISTED IN RCM 1004, VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

## LXXXII

THE MILITARY JUDGE ERRED IN INSTRUCTING SERGEANT MURPHY'S SENTENCING PANEL THAT THEY COULD CONSIDER AGGRAVATING CIRCUMSTANCES OF WHICH THE DEFENSE HAD BEEN GIVEN NO NOTICE PRIOR TO TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

## LXXXIII

TRIAL DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT WHEN THE GOVERNMENT IMPROPERLY SPLIT ONE AGGRAVATING FACTOR INTO TWO.

## LXXXIV

SERGEANT MURPHY HAS BEEN DENIED EQUAL PROTECTION UNDER THE LAW IN VIOLATION OF THE FIFTH AMENDMENT IN THAT OTHER CIVILIANS IN THE UNITED STATES ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES ARMY, BY VIRTUE OF THEIR STATUS AS SERVICEMEMBERS, ARE NOT.

## LXXXV

SERGEANT MURPHY DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL OR HIS ARTICLE 38(b)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION BECAUSE THE TRIAL DEFENSE COUNSEL FAILED TO ADVISE SERGEANT MURPHY OF THEIR CAPITAL LITIGATION DEFICIENCIES (WHICH INCLUDED NO CAPITAL TRAINING AND NO EXPERIENCE IN PRESENTING A CAPITAL CASE) AND THE LEAD COUNSEL FAILED TO ADVISE SERGEANT MURPHY THAT HE HAD DETAILED HIMSELF TO THE CASE.

## LXXXVI

SERGEANT MURPHY WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A GRAND JURY PRESENTMENT OR INDICTMENT.

## LXXXVII

THE MILITARY JUDGE ABUSED HIS DISCRETION BY REFUSING TO ORDER THE PRODUCTION OF FIVE OF THE ELEVEN SENTENCING WITNESSES REQUESTED BY THE DEFENSE.

## LXXXVIII

THE MILITARY JUDGE ERRED BY NOT *SUA SPONTE* INSTRUCTING THE MEMBERS ON SENTENCING THAT THEY COULD CONSIDER THE FACT THAT SERGEANT MURPHY WAS ACTING IN SELF–DEFENSE WHEN THE PANEL DELIBERATED THE QUESTION OF WHETHER TO FIND AS AN AGGRAVATING FACTOR[S] THAT "THE MURDER OF PETRA MURPHY WAS PRECEDED BY THE INTENTIONAL INFLICTION OF SUBSTANTIAL PHYSICAL HARM OR PROLONGED, SUBSTANTIAL MENTAL OR PHYSICAL PAIN AND SUFFERING," GIVEN THAT SERGEANT MURPHY HAD BEEN ATTACKED BY PETRA MURPHY WITH A KNIFE BEFORE HE STRUCK HER WITH THE HAMMER.

## LXXXIX

ASSUMING, ARGUENDO, THAT THE NUMBER OF ERRORS WHICH OCCURRED IN THE INSTANT CASE ARE NOT INDIVIDUALLY SUFFICIENT TO REQUIRE REVERSAL, THESE ERRORS CANNOT BE FOUND TO BE HARMLESS BEYOND A REASONABLE DOUBT WHEN CONSIDERED COLLECTIVELY.

## SUPPLEMENTAL ISSUE I

WHETHER APPELLANT'S COURT–MARTIAL LACKED JURISDICTION TO TRY HIM IN THE FEDERAL REPUBLIC OF GERMANY FOR CAPITAL MURDER COMMITTED THERE DURING PEACETIME.

## SUPPLEMENTAL ISSUE II

WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BECAUSE HE WAS TRIED BY COURT–MARTIAL FOR CAPITAL MURDER IN THE FEDERAL REPUBLIC OF GERMANY IN PEACETIME.

SULLIVAN, Judge (dissenting):

In 1987, James Murphy had a problem—he had two wives. Initially, he was married to a German woman, Petra Murphy, and he was living in Germany with her and two small children—a 5 year-old boy named Tim (Petra's son before she married James) and James, Jr. (his natural son and namesake). However, James' and Petra's marriage was on the rocks, and divorce proceedings had been started in a German court. James Murphy decided he wanted out of this marriage quickly. In June 1987, he married another German woman, Beatra. In July 1987, appellant visited his home state, North Carolina, where he obtained a divorce from

Petra without her knowledge. In August 1987, James was back in Germany and received orders transferring him to Redstone Arsenal, Alabama. Sometime between August 16th and August 20th, when he left Germany for the United States, James Murphy took a hammer and went to the apartment where Petra was living. At that apartment he smashed Petra's head with the hammer and killed her.

Now Murphy had another problem. The two boys were in the apartment and would report him for the murder of their mother. James Murphy drowned each of the boys in the bath tub at the apartment before he left. The bodies were discovered on August 23rd, for the most part, because of the unusual odor coming from the hot apartment. I know the above facts primarily through Murphy's several confessions. In those confessions, he details three separate murders using two separate modes of killing.

The military attorneys assigned to defend Murphy now had a problem. Several detailed and corroborated confessions, as well as a series of incriminating acts showing the motive and intent of their client, gave them an uphill battle to save Murphy's life in a capital murder case.

First, the attorneys attempted to use the affirmative defense of insanity, after Murphy was mentally examined. However, a sanity board (one medical doctor and a Ph.D.) reported that Murphy was mentally responsible at the time of the crimes and had the mental capacity to stand trial. Without insanity as a defense, and doing the best they could with an overwhelming case against them, Murphy's lawyers tried the case, ultimately relying on a defense to the death penalty based on Murphy's utter remorse. *See Harris v. Vasquez*, 949 F.2d 1497, 1524 (9th Cir.1990) (within wide range of professionally competent assistance to not present a psychiatric defense theory but to rely on remorse in capital case), *cert. denied*, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992). He was found guilty by a jury and received the death penalty in December of 1987.

Now, *11 years after these murders*, the majority reverses the death penalty because of the "lack of training and experience" of his trial defense counsel in the defense of capital cases, 50 MJ at 13, and because 3 doctors, hired for money by the defense appellate team over 5 years after Murphy's conviction, have stated in affidavits that, in their opinion, Murphy could not have formed the intent necessary for premeditated murder. One of these doctors also held that appellant, as a result of that mental defect, was not mentally responsible for his crimes. Two other doctors would not hold Murphy liable for the crimes because his mother drank too much when he was in her womb. Based on this material, the majority sets aside the death penalty in this case.

Now I, as an appellate judge, have a problem. I see no legal basis upon which the majority can reverse this case because the defense attorneys might have been better trained. Moreover, I do not agree with the majority that this case should be remanded, just because some defense-selected doctors, many years after the crime and a valid pretrial sanity board under RCM 706, Manual for Courts–Martial, United States, 1984, say Murphy did not intend to commit premeditated murder. The facts in the record and the law do not justify a reversal and remand on this basis. *See United States v. Young*, 43 MJ 196 (1995) (newly acquired psychiatric evidence does not require remand to Court of Criminal Appeals); *Vasquez, supra* at 1515–16 (post-trial defense psychiatric evidence in capital case where defense of remorse relied on at trial does not constitute colorable showing of factual innocence). The record overwhelmingly demonstrates a cold and calculating series of acts by Murphy, which show no defect of reason. The acts of Murphy show he planned and understood the nature and quality of his acts in killing three humans.

First, let us look at the record, which tells us the following facts:

1. James Murphy was a Sergeant, a non-commissioned officer in the U.S. Army.

2. Murphy was a good soldier serving in Germany.

3. Murphy participated in legal divorce proceedings in a German court.

4. Murphy planned and executed international travel to procure a divorce in a North Carolina court.

5. Murphy traveled back to Germany to successfully out-process his unit.

6. Murphy took a hammer to meet with Petra, right before he was about to leave Germany.

7. Murphy successfully killed three people using two modes of killing, and successfully escaped the scene of the crime.

8. Murphy left the scene in such a manner that the murders were not discovered until 3 days after he left Germany.

9. Murphy's defense counsel successfully pursued and were granted a sanity board before the trial.

10. Despite several confessions and much incriminating evidence of motive, intent, and execution of planning the murders, the defense team mounted a reasonable and credible defense, attempting to put suspicion on Murphy's 2d wife, Beatra Murphy.

11. The defense called no witnesses on findings, but called 7 witnesses and offered 28 exhibits on sentencing, including appellant's unsworn statement of remorse.

In light of the above, the entire record shows a competent defense by counsel, and a proper resolution of the issue of Murphy's sanity at the time of the offenses. Federal law for civilians, under the facts in this case, would not allow partisan medical-opinion evidence to be controlling at this late stage of the appellate process, so as to reverse a death penalty case. *Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir.1998); *Shaw v. Delo*, 971 F.2d 181, 187 (8th Cir.1992); *Harris v. Vasquez, supra; see also Moody v. Johnson*, 139 F.3d 477, 482 (5th Cir.1998). Neither does our own case law. In *Young*, 43 MJ at 199 (Sullivan, J., dissenting), I indicated that it might be proper to remand a case to the Court of Criminal Appeals when such evidence could bear on an appellant's lack of mental responsibility at the time of the offenses, but only if this issue was raised for the first time on appeal in our Court.

However, in appellant's case, the sanity issue was raised and settled pretrial. *See* RCM 706. The record of trial in this case shows no evidence that Murphy failed in any way to appreciate the nature and quality of his acts of murder. At trial, there was no hint of defect in his capacity to reason. Finally, no contrary, post-trial evidence was brought within the 2–year period allowed for "newly discovered" evidence. *See* RCM 1210(f).

Now, the majority suddenly exalts defense-selected psychiatric evidence brought in years after the crime, while ignoring facts which clearly show that Murphy did, in a cold and calculating manner, plan and execute three murders. *See Shaw v. Delo, supra* at 186 (appellate court can consider accuser's actions on day of murder in determining whether a reasonable juror could still reject new psychiatric evidence).

The law that the majority establishes in this case generally allows mental responsibility to be an open question, practically forever. *Contra Harris, supra* at 1517–18, quoting *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir.1990). Could we not find a paid doctor today to give an affidavit to prove John Wilkes Booth did not intend to murder President Lincoln? What if Murphy is sent back to a new judge and jury and sentenced to death again? Would we allow another sanity attack to be mounted post-trial and post-period of newly-acquired evidence? Death penalty cases must, of course, be closely scrutinized; however, they should not be allowed to continue forever.

The majority opinion more particularly holds that appellant had unqualified military lawyers representing him in this capital case. It also holds that their representation raised "too many questions" with respect to his death sentence. 50 MJ at 15. Finally, it holds that the post-trial information filed in this case has an uncertain impact on the findings of guilt. The bottom line of the majority is that these circumstances justify a remand to the Court of Criminal Appeals, with a strong suggestion that a findings and sentence rehearing be ordered.

I disagreed with the majority's position in *United States v. Curtis*, 46 MJ 129 (1997),

that military lawyers are, in effect, unqualified to act in capital cases. I disagree with its holding here today to the same effect. Moreover, in light of the cumulative-evidence holding of the majority, what questions are raised with respect to sentence that are not also raised with respect to findings? I do not understand how cumulative evidence of appellant's good motive in confessing would impact on his death sentence in any way.

I also disagree with the majority's "too many questions" standard of appellant review. This standard is entirely inconsistent with federal law (*cf.* Art. 36, UCMJ, 10 USC § 836), which requires an accused to meet a much higher standard to reverse a conviction or death sentence based on post-trial acquired psychiatric evidence. *See Harris, supra* at 1515; *Sellers,* 135 F.3d at 1339 (considering the new evidence with the old evidence, no reasonable juror would still convict). Moreover, it conflicts with the majority opinion in *Young,* because it avoids the requirement for a careful evaluation of the quality of the proffered evidence in light of evidence already in the record of trial. *See* 43 MJ at 199 (evidence in record showing mental state at time of offense). Finally, in view of the particular factual record before us (*see United States v. Cosner,* 35 MJ 278, 280 (CMA 1992) (no reasonable person would change his verdict)), I conclude beyond a reasonable doubt that no different result would be obtained in this case, based on the defense post-trial psychiatric materials.* *See United States v. Young, supra* (newly acquired psychiatric evidence not sufficient to produce more favorable result); *Harris v. Vasquez, supra* (newly acquired psychiatric evidence not sufficient to probably produce an acquittal).

Accordingly, I dissent.

CRAWFORD, Judge (dissenting):

Once again the majority, without explanation or justification, fails to follow Supreme Court precedent concerning the effective assistance of counsel when the sentence is

death. *See United States v. Curtis,* 46 MJ 129, 131 (1997) (Crawford, J., dissenting). In *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a capital case, the Supreme Court set forth a two-pronged test for ineffective assistance of counsel, which this Court adopted in *United States v. Scott,* 24 MJ 186 (CMA 1987). Our opinions consistently have applied that two-pronged test, until *Curtis* and, now, *Murphy.*

By concluding that appellant's counsel were ineffective, the majority attempts to fit a square peg in a round hole. It relies upon the absence of information in the record regarding trial defense counsels' courts-martial experience to support its contention that appellant's defense counsel were ineffective at trial. It also fails to recognize the presumption of competence of counsel, and the high hurdle an appellant must overcome in order to establish prejudice.

## FACTS

I find it telling that the majority gives short shrift to a discussion of the evidence in this case. Determining whether an attorney's conduct falls below an objective standard of reasonableness, and whether an appellant was prejudiced by that attorney's conduct, requires an analysis of the factual evidence introduced at trial.

Assuming for the sake of argument that the first prong of the ineffective assistance of counsel test has been met, one must still consider the prejudice prong. A prejudice analysis should encompass a review of all the evidence presented at trial. For this reason, I shall begin with a discussion of the facts.

Prior to the murders, appellant was involved in a lengthy, acrimonious divorce proceeding in which his ex-wife, Petra Murphy, was demanding more financial support. Appellant told fellow soldiers "that if he had to pay alimony he was going to kill her."

Appellant admitted that, approximately 10 or 11 days prior to the murders, he took a taxi to Petra's apartment complex because he

---

*. This material, of course, could be submitted to the Chief Executive or other authorities for consideration in clemency as suggested by the Second and Tenth Circuits. *Torres v. United States,* 140 F.3d 392, 405 n. 7 (2d Cir.1998); *Sellers v. Ward,* 135 F.3d 1333, 1339–40 (10th Cir.1998).

did not know its exact location. When he arrived, he did not exit the cab, but had the cab driver return him to his own car. Then he drove his own car back to the apartment complex and circled around it a couple of times to see if Petra and the children were there. Although appellant claimed to have an innocent intent in doing so, it is a reasonable inference that his actions were a prelude to the murders.

On the night of the murders, appellant drove to Petra's apartment and parked 100 yards from the apartment complex so that no one would associate his car with the complex. He arrived at 11:15 p.m. In his car he had both the hammer and gloves (the murders occurred in August) that he would use for the murder.

> The victims in this case were appellant's former wife, Petra Murphy, Petra's five-year-old son by a former marriage, Tim Herkstroeter, and appellant's twenty-one-month-old son, James Murphy. The bodies of the victims were found in the bathroom several days after their murders. The bodies of the children lay in a partially filled bathtub; Tim was lying face up, James face down. The forensic pathologist testified at trial that the children were alive and conscious at the time of drowning. Petra was found kneeling beside the tub, her head draped into the water. The forensic pathologist testified at trial that Petra died by drowning but had also suffered at least four severe blows to her head prior to death, one of which fractured her skull, and had injuries on her neck indicative of choking. Petra may have been unconscious when she was drowned.

*Murphy*, 36 MJ 8 (Crawford, J., dissenting).

After committing the murders, appellant wiped off all the fingerprints in the house, arranged the crime scene to make it look like someone else had committed the crime, and then removed and disposed of all the incriminating evidence, including the towel he used to wipe away his fingerprints, Petra's key, and Petra's military dependent identification card. He locked the door and threw the key away, knowing that no one could get into the apartment and that he was scheduled to leave Germany in a few days. The bodies were discovered several days after appellant returned to the United States.

Appellant provided the police with four separate versions of events. Each version is progressively more incriminating and more consistent with the physical evidence in the case. Appellant initially denied any involvement in the murders. He then claimed that he killed Petra because she killed the children. Appellant's third claim was that he killed Petra and his step-son because Petra killed his son. Finally, appellant admitted that he murdered all three of them. Appellant confessed not only to police, but to three others as well.

Appellant demonstrated that he was intimately familiar with the crimes by providing numerous diagrams of Petra's apartment before and after the murders. These diagrams accurately reflected the crime scene. Police also located the gloves and hammer appellant stated that he used during the murders.

DEFENSE COUNSELS' EXPERIENCE

An attorney's lack of experience is not a *per se* bar to trying capital cases. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *See also Wisehart v. State*, 693 N.E.2d 23 (Ind.1998). Admittedly, it is preferable for a defense attorney to have extensive experience in felony cases and jury trials. The majority concludes that, because trial defense counsel, Captains (CPT) Vitaris and Schneller, lacked experience trying capital cases, and did not request the use of experts in sentencing, they must have been ineffective. 50 MJ at 9. Case law does not support such a holding.

The Supreme Court in *Cronic* rejected the idea that the experience of counsel determines effectiveness. In that case, the Supreme Court reversed a lower court decision which found an appointed defense counsel ineffective because he was a young real estate lawyer and had never participated in a jury trial. 466 U.S. at 649, 104 S.Ct. 2039. The Court held that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of inef-

fectiveness in the absence of such an evaluation." The Court noted that "[e]very experienced criminal defense attorney once tried his first criminal case." *Id.* at 665, 104 S.Ct. 2039.

The majority emphasizes that trial defense counsel did not list their qualifications and experience on the record. 50 MJ at 8–9. However, there is no requirement that defense counsel do so. This Court should not imply that defense counsels' failure to reveal their experience and qualifications in any way strengthens appellant's claim of ineffective assistance of counsel. Absent evidence to the contrary, we presume counsel is competent. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Further, the lead defense counsel in appellant's trial was the Senior Defense Counsel of the Hanau Field Office, Trial Defense Service. A military attorney does not ascend to this position without extensive court-martial experience and strong qualifications.

Appellant was represented by two military lawyers who were not associated with appellant's command, but were part of a separate defense counsel organization with its own training, supervision, and headquarters in Washington, D.C. Both attorneys were members of the Judge Advocate General's Corps selected in a highly competitive atmosphere. Upon being selected and commissioned, they received training at the Army Judge Advocate General's School, an American Bar Association approved law school which Congress approved to award a Master of Laws degree (LL.M.). At that school, they received specialized training in litigation, trial practice, and criminal law. Additionally, they were members of a separate public defender organization that conducts periodic training.

Given the common experience of all judge advocates, and what we know of the experience of the lead defense counsel in this case, there is no reason to infer a lack of experience or qualifications absent some showing by appellant. Even if appellant were to present evidence of his trial defense counsels' inexperience or lack of training, this would not be a *per se* showing of ineffectiveness.

Rather, under *Cronic,* such evidence would be only a factor to consider in determining the defense counsels' effectiveness.

### CONFLICT–FREE COUNSEL

RCM 901(d)(4), Manual for Courts–Martial, United States, 1984, based on Fed. R.Crim.P. 44(c) and *United States v. Breese,* 11 MJ 17 (CMA 1981), provides:

> The military judge shall, in open session:
> * * *
> (D) Promptly inquire, whenever two or more accused in a joint or common trial are represented by the same detailed or individual military or civilian counsel, or by civilian counsel who are associated in the practice of law, with respect to such joint representation and shall personally advise each accused of the right to effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the military judge shall take appropriate measures to protect each accused's right to counsel[.]

The Discussion to RCM 910 states:

> Whenever it appears that any defense counsel may face a conflict of interest, the military judge should inquire into the matter, advise the accused of the right to effective assistance of counsel, and ascertain the accused's choice of counsel. When defense counsel is aware of a potential conflict of interest, counsel should discuss the matter with the accused. If the accused elects to waive such conflict, counsel should inform the military judge of the matter at an Article 39(a) session so that an appropriate record can be made.

When a conflict appears on the record, the judge should conduct an inquiry.

In his affidavit, appellant denies that his lawyers discussed representation of Private (PVT) French or advised him of any potential conflict. Now he indicates that, had he been so advised, he would not have consented to representation by CPT Vitaris or CPT Schneller.

The military judge stated in his affidavit that PVT French's case was one of a number

of trials that he presided over between July and December of 1987. He indicated that he did not remember, during appellant's trial, that CPT Schneller had represented PVT French. There was no indication on the record of the prior representation of PVT French.

CPT Schneller states in his affidavit that the representation of PVT French was discussed with appellant. He asserts that appellant agreed that he would continue to represent appellant and would seek release from representing PVT French.

In his affidavit, CPT Schneller states:

Due to [appellant's] irresistible impulse to confess his alleged crimes to anyone who would listen, CPT Vitaris and I, on our own, developed the theory that "Beata [sic] might have done it" and [appellant] was protecting her.... [PVT] French's testimony fit the theory of our case.

CPT Vitaris was in charge of the trial of the case in chief. That is, I handled the opening statement and CPT Vitaris handled all matters thereafter through a verdict by the panel. It was our decision that should the panel not believe our theory that "Beata [sic] might have done it," they would not be in any mood to listen to CPT Vitaris plea for [appellant's] life. Therefore it was felt that it would be better if we separated the case and I presented the sentencing, as I might have more credibility than CPT Vitaris, at that time, with the panel. I can say ... that CPT Vitaris and I were totally devoted to [appellant] and were determined to obtain an acquittal. There was no thought given to a possible conflict of interest with [PVT] French after I was relieved from his case. The decision not to cross-examine [PVT] French had nothing to do with my prior representation and to the best of my knowledge was due solely to the fact that the information to be obtained from cross-examination would have been detrimental to [appellant's] case.

CPT Vitaris corroborates CPT Schneller's affidavit and remembers admonishing appellant to remain silent because PVT French's testimony was consistent with their trial strategy. There was no need or advantage to be gained by cross-examination.

No inquiry was required by the judge under RCM 901(d)(4), because there was not a joint or common trial involving the accused. Nor was the judge unreasonable in failing to remember one of many trials, in fact, a snapshot of one of many trials he presided over while "riding" a trial circuit in Europe during a 6–month period of time. Defense counsel, after they obtained appellant's consent for CPT Schneller to continue his representation, should have informed the judge pursuant to the non-binding discussion to RCM 901(d)(4). However, contrary to the majority's holding, this conflict had no impact on appellant's trial.

As the majority acknowledges, PVT French primarily reiterated information contained in appellant's confessions. 50 MJ at 11. Defense counsel are not required to cross-examine a witness. Indeed, they are only ineffective if their failure to cross-examine falls below the standards set forth under *Strickland. See Brown v. United States,* 625 F.2d 210 (9th Cir.1979); *Sallie v. State,* 587 F.2d 636 (4th Cir.1978). As the majority notes, some of PVT French's testimony was helpful to appellant, which may be why PVT French was not impeached on the stand. 50 MJ at 11.

On findings, the theory of the case was that appellant confessed repeatedly, to all who would listen, because he was protecting the real perpetrator, his wife Beate. In this context, PVT French's testimony supported the defense theory.

An attorney's conflict of interest does not amount to ineffective assistance of counsel unless an appellant was prejudiced by the conflict of interest. *Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The majority determines that appellant may have been prejudiced by the witness' testimony that appellant stated he murdered his son because he did not want to leave any witnesses to the murder. 50 MJ at 11. I disagree.

Similar evidence was presented at trial by a different source and, thus, the challenged testimony could not have prejudiced appel-

lant. During a police interrogation, appellant informed Special Agent Woodall that he killed James, his 2–year–old son, because "the authorities would 'automatically assume' that he was the perpetrator if James survived." *See* 36 MJ at 1141 (quoting R. 425).

Further, a reasonable member could reach this conclusion from the mere fact that appellant murdered everyone in the home. Appellant's *reason* for murdering his son did not tip the scales toward the death penalty in this case. Rather, the *fact* that appellant murdered a toddler, a 5–year–old, and his ex-wife, in a clearly premeditated act, convinced the members to sentence appellant to death. Further, PVT French's testimony did not undercut appellant's contention that he felt remorse for his crime afterwards.

## INVESTIGATION AND EXPLORATION OF APPELLANT'S MENTAL HEALTH AND ABUSE AS A CHILD

An appellant may not raise an ineffective assistance of counsel claim based on actions taken as part of a reasonable trial strategy. *United States v. Curtis,* 44 MJ 106, 119 (1996), *rev'd as to sentence on recon.,* 46 MJ 129 (1997). A defense counsel's selection of witnesses and introduction of evidence are generally issues of trial strategy and "virtually unchallengeable." *Leisure v. State,* 828 S.W.2d 872, 875 (Mo.1992), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992).

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (citation omitted). "A criminal attorney has the duty to investigate, but the scope of investigation is governed by a reasonableness standard." *Mitchell v. Kemp,* 762 F.2d 886, 888 (11th Cir.1985). "[C]ounsel's duty to investigate depends critically on the information furnished by the defendant and his family." *Curtis,* 44 MJ at 121.

If there is *compelling* evidence of mitigation that, for no valid reason, an attorney failed to investigate, an 8th Amendment or a 6th Amendment claim may lie. *See May v. Collins,* 904 F.2d 228 (5th Cir.1990); *Jones v. Thigpen,* 788 F.2d 1101 (5th Cir.1986); and *Blake v. Kemp,* 758 F.2d 523 (11th Cir.1985). However, a tactical decision to forgo introducing mitigating evidence will not support a claim. *May v. Collins, supra* (8th Amendment); *Middleton v. Dugger,* 849 F.2d 491, 493–4 (11th Cir.1988) (6th Amendment).

The Supreme Court in *Strickland* warned that it is "tempting to second-guess" a lawyer's performance, but that a court's assessment of an ineffectiveness claim should try to "eliminate the distorting effects of hindsight." 466 U.S. at 689, 104 S.Ct. 2052. As the Supreme Court stated in *Burger:*

> [Defense counsel] could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." ... We have decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

483 U.S. at 794, 107 S.Ct. 3114, quoting *Cronic,* 466 U.S. at 665 n. 38, 104 S.Ct. 2039, and *Strickland,* 466 U.S. at 690–691, 104 S.Ct. 2052.

*Strickland* was a capital case involving some of the same allegations as here, that is, ineffectiveness in failure to investigate and produce mitigating evidence at the penalty stage. *Strickland's* defense counsel did not produce presentencing evidence because "his conversations with his client gave no indication that [Strickland] had psychological problems." 466 U.S. at 673, 104 S.Ct. 2052. The Court found that there was not a violation of the *Strickland* two-pronged test. *Id.* at 700, 104 S.Ct. 2052. The Court did not, as the majority would, impose a more rigorous standard on the conduct of defense counsel in death penalty cases.

The majority opinion criticizes defense counsel for not meeting face-to-face with appellant's character witnesses. 50 MJ at 12–13. There is no requirement that defense counsel interview witnesses in such a manner. Indeed, such a requirement would place an unreasonable burden upon defense attorneys. It is entirely possible to acquire necessary and relevant information from witnesses over the telephone. I know of no case law suggesting that telephonic interviews are unacceptable methods of communication, and the majority has not cited any.

Defense counsel in this case obtained the names of potential witnesses from appellant, contacted those witnesses, and asked those witnesses for information and names of other witnesses that might be helpful. He then contacted those potential witnesses. During the sentencing stage, seven witnesses from North Carolina testified for appellant. Additionally, there was a stipulation of expected testimony of seven others who were relatives and friends of appellant. These stipulations addressed appellant's hometown, his childhood, and his background. Numerous exhibits were introduced into evidence which favorably showed appellant's childhood background and good character.

Counsel is not ineffective simply because he or she relied on a less than complete psychiatric evaluation. *State v. Sireci*, 502 So.2d 1221, 1223 (Fla.1987). Further, the fact that an accused recently has secured a more favorable expert opinion is an insufficient basis for relief. *Provenzano v. Dugger*, 561 So.2d 541, 546 (Fla.1990). "Disagreements among professionals do not *per se* show incompetence." *United States v. Loving*, 41 MJ 213, 241 (1994). "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *State v. Kenley*, 952 S.W.2d 250, 268 (Mo.1997) (holding that, in light of aggravating evidence, there was no reasonable probability the sentence would be different).

In *Riley v. State*, 110 Nev. 638, 878 P.2d 272 (1994), the Supreme Court of Nevada held that a defense attorney was not ineffective for failing to hire an expert to examine the appellant's mental and physical health, where a pretrial evaluation report gave no indication that the appellant had a mental or physical illness, but only noted the appellant's extensive drug use. The court said, "As a result, we hold that it was not ineffective assistance of counsel, without stronger indications, for [defense counsel] to have failed to order a psychiatric evaluation of [the appellant] based on the information contained in the pretrial evaluation." *Id.* at 280.

Appellant underwent a pretrial RCM 706 sanity board hearing. The sanity board found that he was competent to stand trial and was sane when he murdered his son, stepson, and ex-wife. The sanity board consisted of a psychiatrist and a psychologist, who concluded that appellant was able to "appreciate the nature and quality or wrongfulness of his conduct" and did not have "a severe mental disease or defect" at the time of the murders.

Neither appellant nor any of his character witnesses informed defense counsel that appellant or his mother had been victims of abuse. Thus, appellant's defense attorneys had no reason to investigate further appellant's childhood background or his mental health for either the findings or sentencing portion of the trial. Their failure to investigate further these claims was reasonable, based upon the information provided to them by appellant and his witnesses.

Even if defense counsel were ineffective during findings or sentencing for failing to investigate appellant's recently discovered childhood abuse and mental health evidence, there was no prejudice. In *Buenoano v. Dugger*, 559 So.2d 1116, 1119 (1990), the Florida Supreme Court held that appellant's mental health and childhood abuse "in no way would be sufficient to overcome the overwhelming evidence presented against her at trial." *See also People v. Lear*, 175 Ill.2d 262, 222 Ill.Dec. 361, 677 N.E.2d 895, 902 (1997) (appellant not prejudiced by counsel's failure to present evidence of psychological and physiological defects because aggravating evidence was overwhelming and mitigation evidence was weak); *Johnston v. Dugger*, 583 So.2d 657 (Fla.1991) (defense at-

torney was not ineffective for failing to pursue insanity defense where the court found the pretrial competency examination of appellant was adequate).

Given the strong evidence of appellant's sanity, it is unlikely that the post-trial psychiatric report would have convinced the members to acquit him, even if it had been presented to them. *See Coogan v. McCaughtry*, 958 F.2d 793, 795 (7th Cir.1992) (appellant did not demonstrate that new psychiatric evidence "would probably result in an acquittal"); *United States v. Massa*, 804 F.2d 1020, 1022 (8th Cir.1986) (jury was unlikely to acquit appellant based on new psychiatric report). Thus, even if defense counsel were ineffective in failing to investigate further appellant's mental health, there was no prejudice on findings. Evidence of appellant's guilt for these atrocious crimes was overwhelming. Even if he had presented evidence that he was abused as a child and suffers from a mental illness, it is hard to find any prejudice to appellant.

## CONCLUSION

The majority's decision lowers an appellant's burden in ineffective assistance of counsel cases in which the death penalty has been imposed. Regardless of whether trial defense counsels' conduct was below an objective standard of reasonableness during some phase of appellant's trial, there was no prejudice to appellant given the overwhelming evidence of his guilt. Even absent these alleged errors, the members would have found appellant guilty of the capital offenses and sentenced him to death. I would affirm appellant's conviction and sentence.

For the above reasons, I dissent.